Filed 9/11/15  P. v. Ainsworth CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MAURICE LAMONT AINSWORTH,<br><br>    Defendant and Appellant. | H039571<br>(Santa Cruz County<br>Super. Ct. No. F20150) |

Appellant Maurice Lamont Ainsworth appeals his convictions on 39 counts arising from two different incidents.

In a third amended information filed in Santa Cruz County Superior Court, the district attorney charged appellant with 57 counts in two different cases.[1]

On appeal, appellant challenges his convictions on numerous counts as being unsupported by sufficient evidence.  Further, he argues that the erroneous admission of gang evidence and other evidence of violence denied him a fair trial.  Finally, he asserts that several sentencing errors require that this matter be remanded for resentencing.  As we shall explain, we agree that this matter has to be returned to the superior court for resentencing.

---

[1] Originally, in case No. F17760, the district attorney charged appellant with nine different counts and in case No. F20150 with 51 different counts.  The two cases were consolidated under case No. F20150 and in the third amended information the district attorney charged appellant with 57 different counts.

*Background*

The first 12 counts of the third amended information arose out of a home invasion robbery that occurred on March 27, 2009. The Santa Cruz County District Attorney charged appellant with three counts of kidnapping for extortion (Pen. Code, §209, subd. (a);[2] count 1, victim Teodros Anley; count 2, victim Patricia Anley; and count 3, victim Ezana Anley); robbery (§211, count 4); first degree residential burglary (§459, count 5); two counts of unlawfully taking a vehicle (Veh. Code, §10851, subd. (a), counts 6 & 8); grand theft of an access card (§484g, subd. (a), count 7); receiving stolen property (§496, subd. (a), count 9); dissuading a witness by force or threat (§136.1, subd. (c)(1), count 10); witness intimidation (§137, subd. (b), count 11); and criminal threats (§422, count 12). As to counts 1 through 4, the district attorney alleged that appellant personally used a firearm—a rifle—within the meaning of sections 12022.5, subdivision (a) and 12022.53, subdivision (b), and that appellant personally used an assault weapon within the meaning of section 12022.5, subdivision (b). As to counts 1 through 9, the district attorney alleged an on-bail enhancement (§12022.1) and alleged that appellant had suffered a prior conviction for which he had served a prison term within the meaning of section 667.5, subdivision (b).

Counts 13 through 57 concerned appellant's escape from custody and crimes he committed in an attempt to evade law enforcement, which occurred after appellant was transported from county jail to an outside hospital on November 29, 2010. The district attorney charged appellant with battery with injury on a peace officer (§243, subd. (c)(2), count 13); assault on a peace officer (§245, subd. (c), count 14); attempted obstruction of a peace officer with firearm removal (§§664/148, subd. (c), count 15); battery with injury on a peace officer (§243, subd. (c)(2), count 16); battery with serious bodily injury (§243, subd. (d), count 17); resisting an officer (§69, count 18); battery with injury on a peace

_____

[2] All further statutory references are to the Penal Code unless otherwise indicated.

2

officer (§243, subd.(c)(2), count 19); assault with a taser on a peace officer (§244.5, subd. (c), count 20); resisting a peace officer causing serious bodily injury (§148.10, count 21); firearm removal (§148, subd. (c), count 22); escape by force or violence (§4532, subd. (b)(2), count 23); false imprisonment of a hostage (§210.5, count 24, victim Chelsea McHone); attempted first degree premeditated murder (§§664/187, subd.(a)), count 25, victim Chelsea McHone); second degree commercial burglary (§459, count 26); kidnapping for ransom (§209, subd. (a), count 27, victim Tiffany Chapman); assault with a semiautomatic firearm (245, subd. (b), count 28, victim Tiffany Chapman); attempted carjacking (§§664/215, subd. (a), count 29, Tiffany Chapman's car); first degree robbery of an inhabited dwelling (§211, count 30); criminal threats (§422, count 31); eight counts of false imprisonment of a hostage (§210.5, count 32, victim Tiffany Chapman; count 33, Monica Rocha; count 34, victim Kristin Van Kley; count 35, victim Hayden; count 36, victim Anahi; count 37, victim Feyana; count 38, victim Dean; and count 39, victim C.J.);[3] first degree residential burglary person present (§459, count 40, the Langouev home), two counts of kidnapping for robbery (§209, subd. (b)(1), count 41, victim Vladimir Langouev; count 47, victim Tamara Langouev); two counts of kidnapping for ransom (§209, subd. (a), count 42 victim Vladimir Langouev; count 48 victim, Tamara Langouev); two counts of assault with a semiautomatic firearm (§245, subd. (b), count 43 victim Vladimir Langouev; count 49, victim Tamara Langouev); two more counts of false imprisonment of a hostage (§210.5, count 44, victim Vladimir Langouev; count 50, victim Tamara Langouev); two counts of criminal threats (§422, count 45, victim Vladimir Langouev; count 46, victim Tamara Langouev); first degree residential burglary (§459, count 51, the Bishop home); street terrorism (§186.22,

---

[3] Hayden, Anahi, Feyana, Dean, and C.J. are all minor victims ranging in age from four and a half months to nine months in age. Accordingly, we refer to them by only their first names to protect their anonymity.

3

subd. (a), count 52); possession of a firearm by a felon (former §12021, subd. (a), count 53); carrying a loaded firearm having been previously convicted of a felony (former §12031, subd. (a)(2)(A), count 54); carrying a loaded firearm defendant knew or should have known was stolen (former §12031. subd. (a)(2)(B), count 55); carrying a loaded firearm while being an active participant in a criminal street gang (former §12031, subd. (a)(2)(C), count 56); and carrying a loaded firearm while not the registered owner (former §12031, subd. (a)(2)(F), count 57).  As to counts 20 though 52, the district attorney alleged firearm enhancements (§12022, subd. (b)(1), or §12022.5, subds. (a)/(d), or §12022.53, subds. (b) or (c)).  Counts 14, 20, and 23 contained a great bodily injury enhancement (§12022.7, subd. (a)).  The district attorney alleged various aggravating sentencing factors, such as victim vulnerability (§1170.85, subd. (b), counts 35-50) and binding and tying (§1170.84, counts 40-50).  Further, as to counts 10 through 57, the district attorney alleged that appellant had suffered two prior convictions and had not remained free of prison custody for five years subsequent to those convictions, within the meaning of section 667.5, subdivision (b).

Before trial, the court granted a defense motion to sever the gang charges—counts 52 and 56; and granted a defense motion to bifurcate the bail enhancements, the prior conviction allegations, the binding/tying allegations, and the victim vulnerability allegations.  Appellant waived his right to a jury trial on these allegations, in the event he was found guilty of the substantive offenses.

In the interests of justice, the prosecutor moved to dismiss 15 counts before the matter was submitted to the jury—counts 12, 13, 16, 17, 18, 19, 21, 31, 45, 46, 52, 54, 55, 56, and 57.  The court granted a defense motion for judgment of acquittal (§1118.1) on counts 33, 34 and 35.  Subsequently, however, the court granted the prosecutor's motion to change counts 33, 34, and 35 to *attempted* false imprisonment for protection (§§664/210.5).  The court denied the balance of the defense motions for judgment of acquittal.

4

On January 4, 2013, a jury found appellant guilty of 39 counts, and not guilty of counts 10 and 11 (the criminal threat count §136.1 & the witness intimidation count §137). The jury failed to reach a verdict on count 24—false imprisonment of Chelsea McHone (§210.5), on the firearm enhancements (§§12022.53, subd. (b), 12022.5, subd. (a)) attached to the kidnapping for extortion of Teodros Anley (§209, subd. (a)), and on the premeditation allegation on count 25—attempted murder of Chelsea McHone (§§664/187). The court granted the prosecutor's motion to dismiss count 24 and the allegations on which the jury hung.

After a bench trial, on January 18, 2013, the court found the following allegations to be true: that appellant was out on bail when he committed counts 1 through 9; as to counts 26, 28, 32, 33, 34, 35, 36, 37, 38, 39, 40, 43, 49 and 50 that appellant knowingly used a stolen firearm, an aggravating sentencing factor within the meaning of section 1170.89 [knowledge the firearm was stolen justifies imposition of upper term on the enhancement]; as to counts 35, 36, 37, 38, and 39 that the victims were vulnerable because of their age, an aggravating factor within the meaning of section 1170.85, subdivision (b);[4] as to counts 43, 44, 49 and 50 that the victims were bound or tied, an aggravating sentencing factor within the meaning of section 1170.84. The court also found true two prior conviction allegations (§667.5, subd. (b)).

Appellant was sentenced on April 25, 2013. The operative abstract of judgment reflects that appellant received a determinate sentence of 140 years, two months, consecutive to 42 years to life, for a total of 182 years, two months. The court imposed six indeterminate consecutive sentences of seven years to life on counts 1, 2, 3, 27—kidnapping for extortion (§209, subd. (a)) and 41 and 47—kidnapping to commit robbery (§209, subd. (b)(1)) for a total of 42 years. However, during the oral pronouncement of

---

[4] However, the court found the vulnerability circumstance to be not true as to counts 43, 44, 49 and 50.

judgment at first the court calculated appellant's determinate sentence as 140 years, four months; then the court calculated appellant's determinate sentence as 138 years, four months, consecutive to six life terms of seven years to life. Defense counsel calculated appellant's sentence as 135 years, 10 months.[5]

The court ordered appellant to pay a $10,000 restitution fine (§1202.4, subd. (b)), a corresponding parole revocation fine (§1202.45), suspended unless parole is revoked; a $1,560 court security fee; a $1,180 criminal conviction assessment fee; and victim restitution to Tiffany Chapman in the amount of $7,071.15. Appellant received credit for 1,000 actual days in custody and no conduct credit.

*Evidence Adduced at Trial*

It is well established that we must set forth the facts in the light most favorable to the judgment. (*People v. Johnson* (1980) 26 Cal.3d 557, 562.)

*Counts 1 Through 9—Home Invasion Robbery of the Anley Home*

*i. Events Preceding the Home Invasion Robbery*

Teodros Anley, his wife Patricia, and their son Ezana lived in a large custom home off Hidden Springs in rural Santa Cruz County. The houses on the road are isolated, and the Anleys' residence is not visible from the narrow road. Although the Anleys had lived there since 1989, Teodros[6] knew only one neighbor.

Between September 21 and September 26, 2006, the Anleys' home was burglarized. Several credit cards, a .38-caliber handgun, and one of their cars were taken. The car was discovered in Capitola with the gun inside. On December 5, 2006, again the

---

[5] We concur with the court clerk's calculation that is in the amended abstract of judgment. However, it does not appear to agree with the court's oral pronouncement of judgment.

[6] For ease of reading, we refer to the three members of the Anley family by their first names.

Anleys' home was burglarized. The bed cover in the master bedroom and some smaller items were taken and the room was disorganized.

Between September 16 and September 27, 2006, and between November 16 and December 7, 2006, appellant lived nearby with his mother, Brenda Long, at 19255 Hidden Springs. Mail for residents on Hidden Springs is delivered to mailboxes in a community mailbox area located between the Anleys' residence and the residence where appellant lived with his mother. On December 7, 2006, sheriff's deputies searched appellant's bedroom at his mother's house. In the closet, the deputies found mail addressed to two other couples who lived on Hidden Springs. Among other things, the mail contained credit card statements and convenience checks. On appellant's desk, deputies found a credit card bearing the name of one of the neighbors. On February 16, 2007, appellant was convicted of felony possession of this stolen property.

*ii The Robbery*

In March 2009, Teodros and Patricia worked in San Jose. Typically, they left the house in the morning at around 6:45 a.m. to take Ezana to school. At the time of the robbery he was eight years old. On Friday, March 27, 2009, the family returned home around 6:50 p.m. Patricia was driving her Acura. They opened the driveway gate with the automatic opener and went into the garage. The entry to the house from the garage leads to the middle floor where the bedrooms are located.

Teodros and Ezana entered the house while Patricia was still in the garage. They walked along the hallway into the master bedroom/library, which was at the opposite end of the house from the garage. As soon as they entered the bedroom, Teodros saw that it had been ransacked—everything was dumped on the floor.

As they turned to walk back to the garage, Teodros saw a tall man in dark clothing wearing a mask pointing a rifle at him. The man told him to freeze. Teodros tried to grab the man and take the gun. As the two struggled, Teodros managed to get his finger on the trigger and pull it while the gun was pointed at the floor. Teodros continued to

7

struggle with the man until he was struck in the head from behind by someone else. He fell, and the men tied him up. He blacked out in the hallway by the closet.

Patricia, who was still in the garage, heard a banging sound in the house. At first she did not think anything of it. Soon she saw a man in the garage; he was about six feet tall wearing a ski mask and was carrying a rifle. Ezana was behind the man and said "Mommy" in a scared voice. The man told Patricia to go inside, and ordered her to bind Ezana's hands with rope he had taken from the garage. Patricia complied; she bound Ezana's hands and his feet. The man gave her a scarf and ordered her to blindfold Ezana.

The man ordered Patricia to get on the floor on her stomach. He bound her arms and feet behind her back in such a way that she could not straighten her legs or move. He blindfolded her and put clear packing tape over her mouth. Just before being blindfolded she caught a glimpse of Teodros's calves extending from the hall closet.

Patricia heard a second man close to the staircase near Teodros say "I'm gonna kill this fool." The man spoke a little Spanish, saying words and phrases such as "andele, que paso." Patricia thought that he spoke with a slight Spanish accent. Teodros heard one of the men using a mixture of Spanish and English words; he thought the man was trying to confuse him. For about the next 20 minutes, Patricia heard bottles clinking as though the men were transporting liquor bottles from the upstairs liquor cabinet.

At some point, Patricia heard Teodros say he could not breathe. Teodros had had his hands and feet bound, and he was placed on his stomach in a dark closet; he was not able to stand. The men had blindfolded him and placed duct tape over his mouth. He felt he was suffocating from the duct tape, and one of the men commented that if they did not loosen it Teodros would die.

After the men had bound Teodros, at one point they asked where his wallet was located. He told them it was in his pocket; they took it. The men ordered Teodros to give them his pin numbers; they said they would rape his wife and kill his son if he did not give them the correct numbers. They demanded and took the key to his Lexus. The

men pulled a ring off his finger, which injured Teodros's finger. During this time, Teodros did not know where Patricia and Ezana were. At some point he heard one of the men cussing at Patricia and calling her a "bitch slut."

Patricia was lying bound in the hallway for about 40 minutes. She had tried to free her hands, but the second man asked her what she was doing. Whenever the second man spoke to her he called her "bitch" or "whore" and groped her vaginal area while cursing at her. The first man carried her to the bathtub in her hogtied position and placed her in it face up. Patricia was very uncomfortable and began to whimper because she believed she was about to be raped. The first man told her to stop. He told her "Mommy, just follow orders, my partner has [a] bad temper." Patricia could hear the second man asking Teodros for the pin number to his ATM card; she heard the man tell Teodros that if he gave them the wrong number they would rape his wife. After they obtained the number from Teodros, they returned and asked Patricia for the pin number for her school PTA ATM card. She told the men it was not her money, but the second man ripped her blouse, undershirt, and bra so she gave them the number.

Before the men left the house, they pulled Teodros out of the closet where he had been for about 30 to 45 minutes. Then they flipped over a huge leather chair and put it on top of him, so he was lying face down with the chair on his back. Patricia heard nothing downstairs for about five minutes; then she heard a car driving up the driveway. She went to the garage and saw that the Lexus was gone. She stepped out of the garage and heard the men's voices, so she returned to the bathtub. She put everything back on so it would appear she was still bound and blindfolded.

After about five minutes, Patricia went to look for Teodros. She found him near the master bedroom, bound and with a large heavy chair on top of him. A ski beanie had been taped in place, with the beanie covering his face and tape over his mouth, making it difficult for Teodros to breathe. Patricia used a utility knife to free him. Teodros's face was bruised, he was breathing heavily, and he looked horrified. Patricia noticed that a

9

bottle of bleach and some green cleanser, which she normally kept in the garage laundry area, were in the master bath and half bath.

Patricia called 911 and reported that the family had been robbed. The men had taken and destroyed their cellular telephones and cut the telephone line in the master bedroom, so they had to go to the office to make the call. Patricia gave the telephone to Teodros so she could search for Ezana. Initially, they told 911 that the men might have taken Ezana because they had no idea where he was. However, while still on the telephone with 911, Teodros told the dispatcher that Patricia had located Ezana. Teodros testified that he had sometimes picked up men to help with his work on the house, and he was suspicious that one of the robbers might have been a Spanish-speaking worker. In the 911 call, he described one man as about 6 feet, 4 inches and the other as about 5 feet, 11 inches.

Patricia heard Ezana cry out "Mommy, up here" so she followed his voice to the attic. The ladder had been removed, but she retrieved it to climb up 30 feet to the entrance. She found Ezana blindfolded and bound in the same hogtied manner in which she and Teodros had been bound. Patricia freed him and they descended from the attic. They went to the front of the house with Teodros to await the arrival of the police.

The men took ATM cards from Patricia and Teodros as well as financial papers, travel papers, and immigration documents from the garage safe. Teodros's rifles, a Russian SKS and a Chinese Mak-90 (a variation of an AK-47), had been removed from the bedroom safe. The ring that the man had removed from Teodros's finger was unique because it had his father's name written in script in their native African language. The men took a red jewelry bag and necklace belonging to Patricia.

When the family left home that morning, the Lexus, which had been in the garage, was empty. When they returned home about four or five days after the incident, the Lexus was filled with items that had been in the house, including juice, alcohol, passports, travel bags, paper towels, and Patricia's cellular telephone. A briefcase found

10

in the car contained financial records and immigration documents, and a suitcase was filled with bottles of liquor.

Deputy Sheriffs Dee Baldwin and Damon Gutzwiller were the first officers to arrive at the Anley residence. As they approached in separate cars through the remote, mountainous, densely forested area along Bear Creek Road, they saw a white Jeep driving in the opposite direction toward Highway 9 at "an extremely high rate of speed." Initially, the description of the vehicle taken during the robbery was of a champagne-colored 1998 Lexus, but Deputy Baldwin noticed the Jeep because of its speed. Since in his experience criminals frequently switch vehicles to avoid detection, Deputy Baldwin broadcasted his sighting.

Deputies Baldwin and Gutzwiller met near the long driveway to the Anley residence. At the crest of a hill in the driveway, they spotted the Lexus. After determining that it was unoccupied, they went to the residence. The Anleys came out to meet them. They looked scared but said they did not need medical attention. When another deputy arrived to wait with the family, Deputies Baldwin and Gutzwiller entered the house. They saw rifle ammunition on the entryway floor and a bullet hole in the tile near the stairwell. There was extensive disarray in every room of the ransacked house, and the house smelled of chemical cleanser.[7] After walking through the house, they returned to the Lexus, where Deputy Gutzwiller found two rifles on the back seat under a large gray suitcase.

Officer Koda Hudson of the California Highway Patrol received the initial dispatch regarding a burglary, kidnapping, and auto theft and was on the lookout for a Lexus. Later, he received a report to look for a newer white Jeep Grand Cherokee with

---

[7] An FBI special agent investigating the matter found that there was bleach in the bathroom sink, a can of Comet cleanser in the bathroom, and some clothing on the ground with what appeared to be bleach stains.

shiny chrome rims. He spotted the vehicle and pursued it. Officer Hudson next saw the vehicle in a parking lot of the Quality Inn in Ben Lomond. Two individuals got out of the vehicle: one, who got out from the driver's side, was a taller person wearing a gray sweatshirt and jeans and one, who got out from the passenger side, was a shorter person wearing a black T-shirt and jeans. These individuals began walking south. Officer Hudson ran the license plate and received a report that the vehicle was stolen.[8]

Deputies went to the Quality Inn to secure the vehicle. Inside they saw two large bottles of liquor, a paintball mask, a debit card, credit cards, and a piece of paper. Later, a search of the vehicle revealed a slip of paper for a doctor's appointment for Ezana; and a pink piece of paper with the handwritten numbers "1989," "1988," and "3302." An investigator processed the Jeep for latent fingerprints, but found none even in places where they would normally be, such as the window, door handle, and steering wheel.

Deputies Travis Huntsman and Jeffrey Simpson responded to Ben Lomond and saw a black male wearing dark clothing standing in the middle of an intersection. The man, identified as appellant, put his hands in the air when Huntsman shone a spotlight on him. Appellant was agitated. Although the weather was dry, appellant's clothing was soaked. Appellant had a piece of black cloth around his neck. Deputy Huntsman placed appellant in handcuffs and searched him. He seized several pieces of jewelry, including a gold chain necklace with a crucifix and a gold ring bearing some sort of symbols, as well as a small red pouch. Deputy Huntsman sent a photograph of the ring to deputies at the Anley residence, and was informed that a victim had identified it. Appellant told Deputy Huntsman that the jewelry belonged to his grandfather and he had been at a party where he was jumped by "the KKK."

---

[8] A Patricia Williams had reported the Jeep Cherokee missing on March 11, 2009. After the vehicle was stolen, Williams received a parking ticket from the City of Santa Cruz that had been issued on March 22, 2009, on a street near appellant's apartment.

Chief Deputy Sheriff Terry Parker went from the Quality Inn to an intersection along Highway 9 as an area perimeter was ending. He saw a tall male wearing a black T-shirt, black shorts, and gloves walking south along Highway 9. He turned on his headlights and began driving toward the person. The person then rolled over a guardrail and dropped down to the San Lorenzo River about 20-30 feet below. After a few minutes he saw the person come out of the brush, and he ordered him to freeze. Detective Steve Ryan and Deputy Steve Shiah walked down the embankment where they saw a soaking wet man wearing one glove and a black T-shirt with one sleeve missing. They detained the man, who was later identified as Jyler Raines, and transported him first to the hospital and then to jail. After Raines was detained, Deputy Shiah searched the area by the river and found a black left-hand glove and two $20 dollar bills.

The parties stipulated that bank records showed Teodros's ATM card was used at a bank at 8:22 p.m. on March 27, 2009, to withdraw $600. Another attempt to withdraw money was declined as over the limit. Another card was used in an attempt to withdraw $600 but it was declined as an invalid transaction type. In each instance, a valid pin number was entered. The bank was on Bear Creek Road, the road one must take to get to the Anleys' home on Hidden Springs.

After appellant was placed in custody, he waived his *Miranda* rights and was interviewed by detective Jalon Harris; the interview was recorded.[9] At the time of his arrest appellant was 6 feet, 6 inches tall and weighed about 310 pounds. Appellant stated that Raines's friend, Fernando, had picked up Raines and appellant at the house of appellant's mother to take them to a party in Ben Lomond. Fernando picked them up around 4:00 p.m. in a black four-door Oldsmobile. Appellant did not know anyone at the party. According to appellant, people at the party made racist comments. A man who did not like appellant said that appellant was a "narc" and a "snitch." The man had an

---

[9] A recording of appellant's interview was played for the jury.

13

Aryan Nation tattoo and claimed that he knew appellant from San Quentin. A white male named "Ross" started throwing bottles, and appellant ran off. He had been at the party for an hour and a half.

Appellant told Detective Harris that he ran across the street and into the woods, where he fell into a river. He made a cellular telephone call to Raines. Subsequently, they met by a church near the fire station. He lost his jacket when he got out of the water and thought he must have put his telephone in the jacket right after he called Raines. Shortly after appellant and Raines met by the church, police arrived. Appellant was "cool" with that, but Raines ran off. Appellant had about four or five crosses in his pocket and a necklace with a ring on it. He always carried the jewelry, which had belonged to his late grandfather. Appellant did not know why the Anleys claimed that the jewelry belonged to them. Appellant told Detective Harris that the cloth around his neck was supposed to be a sweatband, but he could not afford one so he tore the sleeve off his T-shirt. When questioned about bleach stains on his pants, he stated that he had had the pants with those stains since he was 16 years old.

In a second recorded interview with Detective Harris, appellant elaborated on his story.[10] He told Detective Harris that Fernando was Caucasian. Fernando drove to the party with appellant in the back seat. The creek into which appellant fell was not deep, but appellant got wet from falling. After they left the party and met up, appellant and Raines intended to walk to the house of the mother of some "dude." Raines thought he saw "Ross" driving by in an old police car and so he ran off. Appellant realized it was actually the police. He thought everything was okay until the police detained him. The telephone he left behind in his jacket was a Blackberry Storm. In addition to the

---

**10** This second interview was played for the jury.

14

telephone call to Raines, appellant also sent texts to two girls whose names he could not recall.[11]

Appellant told Detective Harris that when his grandfather died his grandmother told him he could have whatever he wanted. He picked the jewelry but did not tell his mother he had taken it; he carried the jewelry in a little red pouch. The ring on the necklace was a plain, gold woman's ring.

Detective Mario Sulay interviewed Raines shortly after his arrest. He stated that Raines looked defeated. Raines was hunched over and disheveled, wearing a wet, baggy black T-shirt with the right sleeve missing. He seemed remorseful, and immediately implicated himself and appellant in the crimes against the Anleys without any discussion of possible charges or sentence. Detective Sulay interviewed Raines again on March 30, 2009, and Raines agreed to take investigators on a road trip to find evidence. Raines directed them to the Quality Inn, then to a storage lot at Highway 9 and Fillmore Street, from there to the spot where Raines had been apprehended at Highway 9 and lower Glen Arbor Road, and finally to another spot along Highway 9.

In the storage lot, investigators found a wet, dirty blue sweatshirt with a nylon bag inside that contained the driver's licenses of the Anleys, two credit cards and a silver necklace belonging to Patricia; and a pair of wet sweatpants with bleach stains. In a flat landing area under a bridge on Highway 9, the investigators found a pair of Smith ski goggles, a green knit beanie with a pirate emblem, and a pair of gray Gojo gloves. By the side of the river they found a red satin jewelry purse and a trifold wallet with several pieces of identification for Patricia and Teodros as well as ATM receipts and gold earrings in a Ziploc bag. When investigators showed Teodros the paintball mask they

---

[11] Appellant's cellular telephone records showed that the last call made from his telephone on March 27, 2009 was at 11:04 a.m., and no texts were sent from the phone that day.

found in the Jeep, he was visibly shocked, and he gasped when he saw the ski goggles and beanie. Teodros identified the ski goggles as a pair that he kept in his closet.

DNA found on the beanie and goggles recovered by investigators "matched" appellant's profile.

After reaching a plea agreement with the District Attorney's Office, Raines testified for the prosecution.

Raines explained that in late 2008 or early 2009 he reconnected with appellant; briefly he had known appellant before that time. Raines had been "kicked out" of his father's home and was living with the family of a friend. He and appellant did a lot of partying, drinking, and drugs together. They would break into cars and steal the contents. He and appellant discussed a burglary at a house at which appellant told him they would find guns. Appellant told him the house had safes. Appellant told Raines it was a house in the mountains, and appellant said he was familiar with the house and the area. Eventually the plan evolved into a home invasion in which they would tie up the people and get their social security numbers and pin numbers.

On the evening of March 10, 2009, they left appellant's house and were walking through the west side of Santa Cruz looking for unlocked cars from which they could steal the contents. They came upon a Toyota Corolla that had the key to another car inside. They took the key; when they tested the key it unlocked another car. The car was a white Jeep parked in a driveway near the Toyota. They pushed the Jeep out of the driveway and drove off, but they did not find anything of value inside the Jeep. However, they decided to use the Jeep to drive to the burglary they had been planning. The plan was to cover themselves fully with clothes and use masks. They planned to commit the burglary on a Friday so that when they left the victims tied up no one would immediately notice them missing from work or school. March 27, 2009, seemed a convenient Friday to commit the crime.

16

On the chosen day, Raines had a friend drop him off at appellant's house. In a backpack he had a paintball mask and green beanie he stole from the house where he was living. He brought a pair of gloves. He left his cellular telephone and wallet at appellant's house to avoid having it at the crime scene. He did not want any items from which he could be identified. Appellant had wiped all fingerprints from the Jeep before they entered, and they wore gloves after they got into the Jeep to drive to the Anleys' residence.

It was daylight when appellant and Raines reached the house because they wanted to be sure to arrive before the family. They parked in a turnoff area; appellant said they could walk to the house through a "brushy area."[12] They left the brush by a tennis court adjacent to the house. They looked into the house to see if anyone was inside; they saw a Lexus in the garage. They did not find any unlocked doors or windows from which they could enter the house, but they pried open a small window on the first floor. Raines slid through the window and opened the back door for appellant to enter.

They looked around the large, three-story house to make sure no one was there. They knew that a mother, father, and young child lived there, but they did not have a plan if someone was home when they first entered the house. They kept their gloves on at all times as they walked through the house looking for weapons, safes, and anything of value. They took off their masks. They ransacked the house as they looked through it.

They pried open a gun safe they found in the master bedroom closet. They loaded the guns in preparation for the family's arrival. Other than the guns the only thing they found of value was a large quantity of alcoholic beverages, which they loaded into suitcases. Appellant took some jewelry from the master bedroom. The plan was to load

---

[12] A neighbor testified that she left her house at about 5:00 to 5:30 p.m. and noticed a white Jeep Cherokee parked in a turnout area by the remote mailboxes for the houses on Hidden Springs.

whatever they wanted to take into the Lexus, leave in the Lexus, sell or otherwise get rid of it at some point, and leave the Jeep behind.

At some point they urinated in the sink while running the faucet. They cleaned the sink with bleach because they were concerned the police would obtain DNA from their urine. They used other cleaning products to wash down the sinks.

Appellant and Raines decided that when the family arrived home, appellant would be in the kitchen and Raines would be in the closet under the stairs. They decided that because appellant's mask was not very good, he would wear some goggles they found in the house. They decided they would speak as if they were Hispanic to disguise their voices. They used a Hispanic "tone" and a few common words. While they were in the presence of the Anleys, Raines used a Spanish accent, but he did not recall whether appellant did as well. They found rope and tape they could use to bind the family members. Before the family arrived home they took out one of the wires in the garage so the family could not open the door.

Raines was by a window when the family returned home, and he called out to appellant who was in the garage. Raines hid in the closet with a gun. The plan was for appellant to make a loud noise when the victims entered the house so Raines could leave the closet and surround them. Raines heard people enter the house and saw Teodros and Ezana walk by, but he did not hear any noise from appellant. Ezana was asking his father why someone would ransack their house. Raines left the closet and told them to "freeze." He tried to move Ezana aside but in the process he dropped the gun. Teodros grabbed the gun and they tussled over it until the gun went off. At that point Teodros got scared and jumped, and Raines was able to throw him in the closet and strike him in the face with a fist several times. Ezana was on Raines's back, pleading with him not to hit his father.[13]

_____

[13] At the time of the incident, Raines was 6 feet 5 inches tall and weighed about 190 pounds.

18

Appellant then came into view holding Patricia at gunpoint. She was "screaming, crying, praying," and Ezana started to cry.

Appellant ordered Patricia to tie up her son while Raines sat on Teodros holding the gun. After Patricia finished binding Ezana, appellant bound her hands and feet behind her back. Raines told appellant to put the child in the attic so he would be out of the way, and appellant did so. When appellant returned from the attic, he bound Teodros's feet, and Raines put Teodros's hands together so appellant could bind them. Raines and appellant decided to blindfold the Anleys. They put a blue beanie on Teodros and wound tape around it so it would not come off. They put a tan sack over Patricia's face.

As they began packing the Lexus to leave, Patricia was in their way. Raines picked her up and moved her from the hallway to the bathtub. They took the wallet and Lexus keys from Teodros. While Raines loaded the car, appellant demanded and obtained the personal information they needed from Patricia and Teodros. Raines watched appellant write down a pin number and other information he had obtained from Patricia. At some point, Teodros complained that he could not breathe so they loosened the tape around his face. Before they left, they moved Teodros from the closet to the hallway and flipped a chair on top of him so he could not move.
They opened the garage manually because they had dismantled the automatic door opener. Appellant got in the driver's seat of the Lexus and started pulling the car out while Raines walked next to it. Raines heard a noise in the garage. He saw Patricia and noticed that her blouse was torn open. He told appellant, then jumped into the driver's seat and they drove up the driveway. When they got to the gate, they realized that Patricia would report the Lexus as stolen, so they abandoned it. Raines grabbed two bottles of alcohol and they walked to the Jeep. He threw the bottles in the back seat.

As appellant drove down the driveway, Raines removed the cash and credit/debit cards from Teodros's wallet. He gave the cards to appellant. Raines saw police cars

19

heading towards the house and told appellant to drive faster. Raines threw Teodros's wallet out the car window once he removed the cash and cards.

On the way back to Santa Cruz, they stopped at a Liberty Bank to take cash out on one of the credit cards before they were all cancelled. When appellant pulled into a drive-through ATM they put their masks back on. They managed to get $600 from one card, but the other card did not work. Appellant gave Raines the cash, and Raines put it in the pocket of his pants. They removed their masks when they left the bank.

As they drove off, they noticed a police car behind them. When two other cars turned off the road but the police car remained behind them, they pulled into a hotel parking lot. As the police vehicle pulled into the lot behind them they ran from the car still wearing their gloves. Raines and appellant ran down the side of a bridge and swam through a river. When they got to the other side, they went back up, jumped over a couple of residential fences, and ended up in some sort of construction area. Raines saw some "big-rig trucks" and storage bins. The men discarded their wet clothes. Raines threw his sweatpants and jacket in the bushes; underneath he was wearing shorts and a shirt. Raines had left the paintball mask and backpack in the car. The only property he still had was the cash from the ATM.

Raines and appellant planned to get back on the main road and take the bus back to Santa Cruz. However, because the bus had just driven by, their plan was disrupted. They continued to walk together but took some side streets to get off the main road. When they returned to the main road they saw several police vehicles. They crossed the street, and Raines was about to jump a fence when appellant said he was not running anymore. Raines went over the fence. He heard appellant tell the police he had been jumped at a party, but when he saw the police arrest appellant, Raines continued running.

Eventually, Raines became tired. He came back to the main road by a bridge at a three-way stop light; he asked a man for a ride back to Santa Cruz. However, the man refused. Raines saw an undercover police car coming across the bridge and jumped off

20

the side.  He fell down about 50 feet.  A police officer was looking over the side with a flashlight; Raines heard the officer calling for backup.  The officer pointed a gun at Raines and told him to "freeze"; Raines stayed where he was.  While other officers were on the way down, Raines removed the cash from his pocket and buried it.  He waited until the officers arrived and arrested him.

Officers took Raines to an interrogation room in a building across the street; Raines knew that the police had no evidence linking him to the Anley home invasion. However, Raines felt "kind of sick with[him]self" and decided to tell Detective Sulay what had happened.  He was mostly truthful, but he told the detective that the kidnapping happened accidently when the family arrived home rather than admit that it was part of the plan.

While in jail, Raines got a tattoo of friends he referred to as the "Four Brothers." One of the men depicted was Fernando Villalobos, who was 5 feet 11 inches tall with a medium build.  Fernando spoke some Spanish.

*Counts 13 Through 25*

In November 2010, Santa Cruz County Sheriff's Deputy Cathy Bramanti was assigned to transport jail inmates to medical appointments.  Inmates were not informed ahead of time when they would leave the jail for a medical facility in order to keep them from planning an escape with people on the outside.  Before transporting an inmate, she placed the inmate in handcuffs and ankle restraints.  When an inmate required an MRI, however, Bramanti had to remove the restraints at the MRI center because a person cannot be wearing any metal when undergoing an MRI.  Deputy Bramanti had first transported appellant several months earlier for an X-ray; the transport occurred without incident.  On November 23, 2010, Bramanti transported appellant to the MRI center and removed his restraints, again, without incident.  In approximately 500 transports she had never had an inmate try to escape.

21

On November 29, 2010, once again Deputy Bramanti transported appellant for an MRI at the MRI center. On that visit they had to wait a while after the scheduled appointment time of 10:15 a.m. She expressed her concern about having an inmate out of custody for so long, but facility staff told her they were just finishing an emergency MRI. At 11:10 a.m., she was able to escort appellant to the MRI room. She removed appellant's chains so he could use the restroom; when appellant came out of the restroom the deputy continued to escort him to the MRI room. While appellant went into the scanner room, the deputy waited about 25 feet away. Deputy Bramanti was wearing her duty belt, which held her radio, handgun, an extra ammunition magazine, a taser, pepper spray, and handcuffs. The gun held 15 rounds plus one in the chamber.

After about 35 minutes, appellant left the MRI scanner accompanied by Chelsea McHone, an employee of the MRI center. Deputy Bramanti had the chains ready to apply to appellant, and she walked toward him as he left the examination room. The deputy directed appellant to go to the chairs so she could apply the chains; appellant complied.

Just as Deputy Bramanti bent over to begin to apply the chain to appellant's first ankle, she noticed appellant looking over his shoulder. The deputy felt that something was not right. Suddenly, appellant elbowed the left side of her head, knocking her off her feet. Before she could get up, appellant tackled her to the ground. As Deputy Bramanti landed, appellant was already lying across her body reaching for her firearm. Deputy Bramanti landed on her right side where she keeps her gun. As appellant was going for the gun with both hands, the deputy kept her left hand on her weapon; she thought that if appellant managed to get her gun she was going to be dead.

Chelsea McHone was the first person to respond to the commotion. She saw appellant on top of Deputy Bramanti using his legs to pin her arms and using both fists to punch her in the face, chest, and abdomen. She yelled at appellant, "What the fuck man? What are you doing?" Appellant stopped and said, "I will fucking kill all of you."

Deputy Bramanti yelled for someone to call 911 because she could not reach her radio. John Rider, an MRI technician at the MRI center was getting the MRI room ready for the next examination when he heard a scuffle and McHone's voice. He looked over and saw Deputy Bramanti's legs on the floor. He saw appellant wrestling with the deputy for her gun; to him it looked as if the deputy "was kind of a rag doll getting tossed around . . . ." Appellant had one arm around Deputy Bramanti's head and the other trying to grab her gun. Rider tried to grab the arm with which appellant was going for the gun.

Desperately, Rider called for Dr. Martinez's assistance because the doctor was a large man. As Dr. Martinez responded and came around the corner he saw appellant wrestling with Deputy Bramanti on his right arm and Rider on his left. Appellant was battering the deputy against the wall. The deputy was trying to prevent appellant from reaching her firearm, but appellant was putting more effort into getting the gun than he was in fighting off Rider. As Dr. Martinez approached, appellant began to disengage. Appellant stood up so quickly that Deputy Bramanti lost her grip. As appellant took off running, the deputy stayed on the ground apparently trying to recover from head trauma. After about five seconds, Deputy Bramanti's eyes appeared able to focus, and she took off in pursuit of appellant.

Deputy Bramanti heard appellant run out the door but she did not see him. However, when she got outside she saw appellant running across the parking lot toward the street. She followed appellant as he ran along a fence line until he finally tried, unsuccessfully, to jump the fence. Deputy Bramanti felt she could not shoot appellant because they were by a residential area, so she intended to fire her taser at him when he came off the fence.

When appellant came off the fence, it appeared he was going to run back through the parking lot. Suddenly, when appellant was about 12 feet away from Deputy Bramanti, he turned and ran at her. The deputy tried to grab her taser but instead got only

her outer jacket. Appellant bear-hugged her and took her to the ground. Appellant fell on top of Deputy Bramanti. She fell on her right side again to try to protect her holstered gun, but her hand was trapped between their bodies. Appellant was punching the deputy in the face, and she knew it was only a matter of time until he knocked her out. She tried to punch appellant in the face, but she had no leverage and the punch landed harmlessly on his chin. Then, she attempted a palm strike to appellant's nose. Appellant began moving his head from side to side so she kept her palm planted on his nose. Then, violently, appellant bit Deputy Bramanti's right index and middle fingers. She was in excruciating pain and felt her fingers might detach, but she kept her hand in appellant's face. She used her left hand to cover her weapon, and yelled at appellant "you don't have to do this." Appellant replied, "I'm sorry" and punched her in the face again.

As Deputy Bramanti was reaching for her gun with her left hand, her taser was exposed. Appellant tore the taser out of her belt. Bramanti tried to roll over to draw her firearm when appellant shot her in the head with her taser. She felt excruciating pain and was immobilized for five to 10 seconds. She felt appellant take her firearm. When she was able to see, she saw appellant running with her gun. She got up to give chase but realized she had no gun and her taser had been used. Accordingly, she had no weapon with which to stop appellant.[14]

When Deputy Bramanti ran out of the MRI center in pursuit of appellant, Rider went to the front desk where he saw that one of the employees, Miranda Michaels, was on the phone with 911. McHone saw Deputy Bramanti outside, and she ran out with Rider; Dr. Martinez was close behind. McHone ran out of the MRI center behind

---

[14] As a result of the incident, Deputy Bramanti was diagnosed with post-traumatic stress disorder, which was confirmed by an EEG. Her symptoms included sleep disturbance, chronic hypervigilance, depression, intrusive thoughts, and memory loss. In addition, she sustained a right jaw fracture so severe that her teeth were no longer properly aligned and her jaw did not close properly. She suffered soft tissue damage to her right middle and index fingers as a result of the bite.

Deputy Bramanti so she would be able to tell police where appellant went. She saw appellant and the deputy run across a parking lot full of cars. She stayed by the door to watch, but at one point stepped inside briefly to give information to Michaels who was still on the phone with 911.

When McHone walked back outside she did not see anyone, but she heard Deputy Bramanti screaming from down in a ditch. McHone ran to help the deputy; she saw appellant running back from the direction of the ditch. He was running in the direction of the freeway when he appeared to spot McHone. Appellant turned and looked at McHone over his shoulder. He lifted a gun, pointed it at her head and said "Freeze. Don't move." As soon as appellant told McHone to freeze, she started to run. She did not know where to go until she saw Rider standing at the side entrance to the MRI center with the door open; she ran toward the door. Dr. Martinez saw appellant pull the trigger of the gun he was holding and saw a pop of turbulent air. Appellant was about 12 feet from McHone and was standing still when he fired. Dr. Martinez heard a bullet pass to the left side of McHone at about shoulder level and hit the side of the building. As Rider was entering the building, he heard one shot. He closed the door behind him to keep appellant out. Rider, McHone, and Dr. Martinez ran to Dr. Martinez's office where McHone was crying and said, "I can't believe he shot at me."

*Counts 26 Through 39*

That same morning, Tiffany Chapman was working as a teacher in the nursery at Secret Garden Too, a day care and preschool. Another teacher, Monica Rocha, was working in the nursery that day. The nursery is on the second story of the building. The teachers had five infants that day, including Chapman's daughter Feyana. Only two of the infants, Feyana and Dean, were ambulatory. The other infants were nine-month-old Anahi, four-and-a-half-month-old Hayden, and six-month-old C.J.

Chapman and Rocha were sitting on the floor playing music to calm the infants when Chapman heard thumping footsteps running up the ramp to a door that was not

typically used for entry into the facility. Chapman saw appellant approaching wearing a yellow jumpsuit. At about the time Chapman saw appellant, Kristen Van Kley arrived to pick up her son Hayden.[15] When Van Kley arrived, Rocha was holding Hayden. The women heard a loud noise as appellant burst through the door. Loudly and strongly, appellant said, "Don't move"; the three women saw him holding a gun out at about his chest level; his eyes and gun swept the room. About a second after appellant ordered everyone not to move, Van Kley ran out the door with Rocha close behind; Rocha was still holding Hayden. Rocha estimated it was about six seconds between appellant's command and the time she fled the room. Van Kley ran into the main building where the preschool was located; she was screaming. Rocha followed her; she was also screaming. Van Kley was just screaming, but Rocha was able to tell another employee that there was a man with a gun and to telephone 911.

Chapman remained in the nursery. Every baby was crying. As appellant swept the room with his gun Chapman put up her hands. Appellant walked by the crib enclosure. Baby Dean was by a changing table and Feyana was trying to pull herself up on her mother's leg. Appellant stood directly in front of Chapman holding the gun down at an angle and locked eyes with her. In desperation, Chapman told appellant to take whatever he wanted. Appellant ordered her to give him her car key. At that point, appellant had scanned the room for about 30 seconds to a minute. Chapman told appellant her keys were in her purse on a shelf and pointed to the location where she normally kept her purse. As appellant began rifling through a diaper bag, Chapman realized she had left her purse at home. She told appellant she forgot her purse and instead her keys were in her jacket. Chapman grabbed the jacket from a post by the crib enclosure. When she did not find the keys in the first pocket she checked, she felt "panicked." Appellant stood over Chapman holding the gun and told her, "You have

---

[15] According to Van Kley, she arrived to pick up Hayden at 11:45 a.m.

three seconds." She found the car key and gave it to appellant. Chapman pointed out her black Jetta, and appellant ran down the ramp toward the car. Appellant was in the nursery for approximately five minutes. He had not moved or otherwise touched the babies.

Initially, Chapman lost sight of appellant when he reached the end of the ramp leading back to the parking area. Chapman put the babies in cribs. Then, she wedged a chair under the doorknob and dragged a table against the door. As she put the babies in the crib she saw the driver's side door to her car open; appellant leaned over the front seat. Chapman was unable to get a signal to telephone 911 so she used the internal intercom to contact the preschool. The woman she reached told her she was on the other line with the 911 dispatcher.

*Counts 40 Through 50*

In November 2010, Vladimir Languev, then age 61, and his wife, Tamara, were visiting from Russia. They were staying with their son, his wife (Olga Grishina), and their nine-year-old granddaughter, all of whom lived at 118 English Drive in Santa Cruz. Vladimir spoke only Russian although he understood a little English.

On November 29, 2010, Vladimir and Tamara[16] were alone in the home for the first time. They began cleaning the house at around 10:00 a.m. Vladimir went upstairs to finish cleaning and then went to use the computer. He heard a strange noise and then heard a voice. One voice was Tamara's; he thought she was talking to workers who were installing a new deck. This surprised him because previously the workers had not done anything inside the house.

Vladimir went downstairs because he spoke English slightly better than Tamara. He noticed that Tamara's voice seemed nervous and "very excitable." As he descended he saw the back of a large, strong man. The man, appellant, turned toward Vladimir with

---

[16] Again, we refer to the Languevs by their first names for ease of reading.

27

a gun; he pointed it at Vladimir.[17]  Appellant was wearing a bright orange uniform that said "Santa Cruz."  Sharply, appellant said "Come"; then he grabbed Vladimir's arm and threw him on a bed.  Vladimir saw that Tamara's feet were bound with yellow fabric. She looked pale and very scared.  Appellant tried to bind Vladimir's hands and feet with towels and then tried to bind his hands with a shoelace, but the binding was not secure. Vladimir and Tamara were seated on the bed in the master bedroom for about 20 minutes, but they were able to free their hands from the bindings.  Tamara was worried that they would not be able to pick up their granddaughter after school.  Vladimir and Tamara tried to speak to each other in Russian, but appellant threatened them with a gun.  After 20 minutes, appellant unbound their feet, and all three left the master bedroom with appellant pointing the gun at them.  Vladimir heard sirens in the neighborhood and thought that they were connected to appellant.  He understood that appellant was holding them hostage.

Appellant asked Vladimir and Tamara who they were.  Vladimir showed appellant the vacuum cleaner, indicated they were house cleaners, and told appellant the homeowners were an American family he did not know.  Appellant asked if they had car keys, but Vladimir told him they did not.  Appellant bound their hands again with shoelaces, but not tightly.  They remained on the third floor of the house for about one to one and a-half hours.  When Vladimir's cellular telephone rang he knew it had to be his son or daughter-in-law so he tried to answer it.  Appellant grabbed the telephone and threw it on the bed.  When Tamara tried to answer it, appellant grabbed the phone from her and said "no."

Grishina had called the house around 12:00 noon because she had started a new job that day and her in-laws were supposed to pick up her daughter Sonia after school. According to Grishina, Vladimir and Tamara were acting "weird" and kept hanging up,

---

[17] The parties stipulated that appellant was the large man in the Languevs' home.

28

so Grishina kept calling. She heard an unknown man's voice. Finally, she was able to speak with Tamara on their landline. Tamara told her in Russian that they were being held hostage and to hang up. Grishina called 911. The dispatcher knew something was happening and just needed her home address.

After some time Vladimir, Tamara, and appellant went downstairs to the kitchen, where appellant drank some water from the sink but refused Vladimir's offer of juice, whiskey, and food. Appellant looked out the window for police, but did not see any officers. At that point a little more than two hours had passed since Vladimir first saw appellant, and he no longer heard sirens. They returned to the third floor. Appellant used a downstairs telephone to make a call. Appellant was on the telephone for about five minutes, but the only words Vladimir understood were "mother" and "Russian." Throughout his time in the house, appellant had been pointing a gun at them and yelling loudly, but after the telephone call appellant became softer and stopped making direct threats. Appellant made a second call where the only word Vladimir understood was "taxi."

After the second telephone call Vladimir offered to help appellant change clothes. Toward the end of the time on the third floor, appellant discussed changing his clothing; he removed his shirt and pants. They went down to a closet on the second floor to find clothes but everything was too small. Tamara found a large T-shirt on the first floor, and they found some pants and shoes by the garage entrance. The shoes were small; however, appellant accepted them.

Vladimir offered to go out to the street as a lookout; to his surprise appellant agreed. Vladimir put on his shoes and walked slowly to the street without closing the door behind him. As he walked closer to the street to look, he looked right and saw that the street was blocked by police vehicles. To the left he saw two officers behind his son's car. One officer aimed a gun at him, another officer screamed "come." Vladimir started walking slowly because he did not know what appellant might do to his

wife, but the officer shouted "quickly." Vladimir was concerned because he could not see Tamara.

When Vladimir reached the police they asked him who he was. He told them he was Russian and wanted to go back into the house because Tamara was there. The police stopped him. He saw that his son's dog was outside, and Tamara ran out calling the dog's name. Tamara ran to where Vladimir was standing with the police. About 15 minutes later, Grishina arrived followed a while later by Vladimir's son. Grishina saw that Tamara was crying and that Vladimir was pale; both had shaking hands. Tamara did not feel well so someone called an ambulance.[18]

*Count 51*[19]

Joseph Bishop lived at 120 English Drive. On November 29, 2010, he returned home at about 12:00 noon and ate his lunch. As he approached English Drive he saw several police cars speed by. From his back deck he noticed more police activity. He was home for about 30 minutes. When he left to return to work, he was about to turn left from his street when he saw some police cars and an officer standing there. He stopped to run a couple of errands. When he was back in his car he received a call from a law enforcement friend who told him there was a manhunt for an escaped inmate from Dominican Hospital. The friend told him it was in the area of his house and suggested that Bishop return home. When Bishop returned he gave his house key to an officer who

---

[18] Tamara suffers from high blood pressure and Vladimir from arrhythmia, which was exacerbated by the trauma of being tied up and held hostage at gunpoint.

[19] Counts 52 through 57 were not concerned with any particular factual scenario but included the following charges: street terrorism (§ 186.22, subd. (a)), possession of a firearm by a felon (former § 12021, subd. (a)(1)), carrying a loaded firearm having been previously convicted of a felony (former § 12031, subd. (a)(2)(A)), carrying a loaded firearm knowing that the firearm was stolen (former § 12031, subd. (a)(2)(B)), carrying a loaded firearm while an active participant in a criminal street gang (former § 12031, subd. (a)(2)(C)), and carrying a loaded firearm while not the registered owner (former § 12031, subd. (a)(2)(F).

told Bishop the police were doing a house-to-house search. Bishop waited in the area for two to three hours talking with his neighbor, Olga Grishina, who was standing with her in-laws.

Lieutenant Daniel Flippo led a law enforcement team assigned to clear houses on English Drive in the search for appellant. The house at 120 English Drive was the last house to be checked. The purpose in entering that house, as well as the other houses, was to make sure no residents were in harm's way. Lieutenant Flippo believed that appellant was in the house at 118 English Drive, and the house next door, 120 English Drive, would provide a place from which they could observe it. One of the officers broke the door to the garage of 120 English Drive, and the team entered the house through the garage.

Eight officers, including Officer Carter Jones and Sergeant Arnold Vasquez, were part of the arrest response team. They entered 120 English Drive along with a canine officer. They heard a loud thump when they made their initial entry. The officers entered from the garage into the kitchen and cleared the first floor in about a minute. The officers went to the bottom of the stairwell; the canine officer went up first. The dog began barking and scratching at something that sounded as if it was a door, which the officers understood to be the dog alerting them that someone was present. The canine's handler brought the dog back down, and an officer called for the person upstairs to come out with his hands up. Appellant came out fairly quickly. Lieutenant Flippo ordered him to put his hands in the air, to turn around, get on his knees, and slide down the stairs with his hands up; appellant complied. One of the officers handcuffed appellant. Appellant was disoriented and his speech was slurred. When asked where the gun was, he indicated it might be in the bedroom. Appellant's pupils were dilated, his pulse was low, he was pale, and he had beads of sweat on his forehead.

Officers searching the upstairs found it in disarray. The attic crawlspace door was open and the sheetrock in the bathroom ceiling had been ripped out. Several prescription

31

pill bottles had been emptied. Bishop noted that a full bottle of a sleep aid had been emptied. Appellant's appearance and physical condition at the time of his arrest were consistent with having ingested the pills.

After the escape, appellant was subjected to a custodial strip search at the jail. During the search, the officers found a kite[20] in appellant's anus. The kite talked about bank accounts, online banking, obtaining a lawyer, and getting a job. Correctional Officer Barnes stated it appeared to him to be "information that somebody would need if they were trying to get somewhere."

*Defense Case*

The defense recalled Deputy Gutzwiller as its sole witness. Deputy Gutzwiller testified that he interviewed Teodros at his residence about 20 to 30 minutes after the deputy arrived. At that time, Teodros described one suspect as African American and standing between 6 feet 2 inches and 6 feet 4 inches with an average build. Teodros described the second suspect as Hispanic and standing about 5 feet 10 inches with an average build; he based his assessment of the person's race on the person's Spanish accent and stated that the suspect was wearing a mask. Teodros told him that he had not seen the second suspect prior to being pushed; he was already on the ground before he got a glimpse of him, and the second suspect was on the ground with Teodros. Teodros never told Deputy Gutzwiller that he had been blindfolded and did not indicate that he had ever seen the second suspect standing.

Appellant's trial counsel argued that Raines had lied about appellant's involvement in the burglary of the Anleys' home. He argued that Raines's friend, Fernando Villalobos, matched the description Teodros gave the police of the second suspect.

---

**20** Correctional Officer Alonzo Barnes explained that a kite is "a small note wrapped up and packaged in some small way . . . ."

*Discussion*

Since appellant challenges the sufficiency of the evidence to support several of the counts of which he was convicted, we set forth the law relevant to his challenges.

When determining whether the evidence is sufficient to sustain a conviction, this court's "role on appeal is a limited one." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) " 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]' " (*Ibid.*)

The federal standard of review is to the same effect. Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

"Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

As a reviewing court we must "draw all reasonable inferences in support of the judgment." (*People v. Wader* (1993) 5 Cal.4th 610, 640.) Reversal is not warranted

33

"unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

*Sufficiency of the Evidence—Count 3*

*Background*

The district attorney charged appellant in counts 1 through 3 with kidnapping for extortion (§ 209, subd. (a)) of each of the three members of the Anley family—Teodros, Patricia and Ezana. The court instructed the jury that as to counts 1, 2 and 3, the People had to prove that, "one, the defendant seized or confined another person; two, the defendant held or detained the other person; three, the defendant did so to commit extortion or to get money or something valuable and, four, the other person did not consent to being seized or confined." Further, the court instructed the jury that "Someone intends to commit extortion if he intends to, one, obtain a person's property with a person's consent and, two, obtains the person's consent through the use of force or fear." The verdict forms for all three counts reflect that the jury found appellant guilty of kidnapping for extortion; and it does not appear that as to those three counts the jury had an option of finding him guilty of kidnapping to get money or something valuable.

Section 209, subdivision (a) provides: "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for life without possibility of parole in cases in which any person subjected to any such act suffers death or bodily harm, or is intentionally confined in a manner which exposes that person to a substantial likelihood of death, or shall be punished by imprisonment in the

34

state prison for life with the possibility of parole in cases where no such person suffers death or bodily harm."

As "the statute [§ 209, subdivision (a)] is phrased in the disjunctive, it describes four different types of aggravated kidnapping: (1) for ransom; (2) for reward; (3) to commit extortion; and (4) to exact from another person any money or valuable thing." (*People v. Ibrahim* (1993) 19 Cal.App.4th 1692, 1696.) "Extortion is the obtaining of property from another, with his [or her] consent . . . induced by a wrongful use of force or fear . . . .[21] (§ 518, see § 7 [masculine gender includes feminine].) "Fear, such as will constitute extortion, may be induced by a threat . . . . [¶] 1. To do an unlawful injury to the person or property of the individual threatened or of a third person . . . ." (§ 519)

Appellant argues that as to count 3—the kidnapping for extortion of Ezana—the evidence was insufficient as there was no evidence of extortion. Appellant asserts that there is no evidence that appellant obtained any property from Ezana. The evidence established that appellant and/or Raines had Patricia bind Ezana's hands and feet and blindfold him. Appellant then put Ezana in the playroom in the attic, to get him out of the way. Ezana remained unharmed in the attic until the robbers left the house, when Patricia found him.

The fact that appellant did not obtain any property from Ezana is irrelevant. Kidnapping for extortion can involve a primary victim (who is seized, confined, or otherwise subjected to a predicate act—in this case Ezana) and a secondary victim (who

---

[21] The people assert that while the statute addresses four different types of aggravated kidnapping, the jury was instructed on only the third type—kidnapping for extortion. Although the written jury instruction was entitled "Kidnapping For Extortion (Pen. Code, § 209(a))" the wording of the instruction included the fourth type of kidnapping—kidnapping to exact from another person any money or valuable thing. However, since as we have explained, the jury was only given the option of finding kidnapping for extortion, we must assume that the jury ignored the "or to get money or something valuable" language. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 670 [reviewing court presumes jurors are intelligent and possess common sense].)

is subjected to an extortion demand—in this case Teodros, who was threatened that if he did not give appellant and Raines the correct pin numbers they would kill Ezana). (*People v. Martinez* (1984) 150 Cal.App.3d 579, 591, (*Martinez*), disapproved on another ground in *People v. Hayes* (1990) 52 Cal.3d 577, 628, fn. 10.) This is quintessentially kidnapping for extortion. Of course, the same person may be both the primary and the secondary victim. (*People v. Ibrahim*, *supra*, 19 Cal.App.4th at pp. 1696-1698.)

Alternatively, relying on *Martinez*, *supra*, 150 Cal.App.3d 579, appellant argues that no kidnapping of Ezana occurred.[22]

In *Martinez*, the court reviewed the history of section 209, subdivision (a) dating back to before 1933. The court noted that the statute was amended in 1951 to require that the asportation required for kidnapping for robbery must be more than the movement of the victim that would be incidental to most robberies, but the Legislature did not create such a requirement for kidnapping for extortion—which still required no act beyond seizure or confinement. (*Martinez*, *supra*, 150 Cal.App.3d at p. 588.) In *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*), our Supreme Court had stated: "[W]e hold that the intent of the Legislature in amending Penal Code Section 209 in 1951 was to exclude from its reach . . . those [robberies] in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*Id.* at p. 1139.)

_____

[22] In *Martinez*, *supra*, 150 Cal.App.3d 579, the defendants challenged their convictions of kidnapping for ransom or extortion. (*Id.* at p. 587.) They argued that section 209 could not have been intended to reach conduct that is, essentially, a multivictim robbery. In support of their contention, the defendants traced the history of section 209 and pointed to various anomalies that would result from interpreting subdivision (a) to apply to the facts of the case. The *Martinez* court agreed with their arguments and found that no kidnapping of the victim had occurred. (*Matinez*, *supra*, at pp. 587-588.)

36

Relying on *Daniels*, the court in *Martinez* held that the holding in the *Daniel's* case "would be circumvented if either subdivision of section 209 is construed to reach those multivictim robberies in which the movement *or restraint* of the purported kidnap victim is merely incidental to the commission of the robbery and does not substantially increase the risk of harm over and above that necessarily present in the crime of the robbery itself." (*Martinez*, *supra*, 150 Cal.App.3d at p. 595.) The *Martinez* court acknowledged that while the crime in the case before the court "might technically fall within [the kidnapping for extortion] category, we do not think that the purported kidnap victim was subjected to any greater confinement or risk of harm than is incident to a 'normal' multivictim robbery." (*Id*. at p. 591.) The court emphasized that its holding was limited " to what is necessary to prevent the *Daniels* line of cases from being circumvented by charging what is essentially a multivictim robbery as a kidnapping for ransom." (*Id*. at p. 595.)

In *Martinez,* the defendants entered the victims' house. While one defendant immediately took control of the husband, the other went to the bedroom and told the wife that if she screamed the first defendant would hit or shoot her husband. The second defendant then took several items from the dresser and forced the woman to engage in three acts of sexual intercourse. During the time that the second defendant was in the bedroom with the wife, the first defendant had used strips of the husband's robe to bind him. (*Martinez*, *supra*, 150 Cal.App.3d at p. 586.) Among several other crimes, the defendants were charged and convicted of kidnapping the husband for ransom and extortion under section 209, subdivision (a). The *Martinez* court found that under these facts, no kidnapping of the husband occurred. (*Martinez*, *supra*, 150 Cal.App.3d at pp. 587-588.) Following the reasoning of *Daniels*, the *Martinez* court found that the restraint of the husband was incident to the robbery and did not "substantially increase the risk of harm beyond that inherent in the robbery itself." (*Id*. at p. 593.)

37

In contrast to *Martinez,* in this case, Ezana, an eight-year-old boy, was removed from his parents and placed in the attic. All of the victims had been bound and blindfolded and none knew where the others were located. While Raines testified that he told appellant to put Ezana in the attic to get him out of the way, both defendants knew it was a large house, and they did not have to place the bound child in the attic if their sole concern was that he not hamper their movement in taking the Anleys' property to the garage. When appellant wanted to obtain the credit and debit card pin numbers from Teodros, his threat to kill Ezana was intensified by the fact that Teodros had no idea where his son was located or even if he was still alive.

Thus, the decision to bind Ezana and move him into the attic was not merely a restraint incident to the robbery. More importantly, the risk to Ezana by moving him into an attic far from his parents significantly increased the risk of harm, particularly psychological harm, to the young isolated child. The attic hatch was closed and the ladder removed, which decreased the chances the boy would be found right away. As our Supreme Court noted in *People v. Laursen* (1972) 8 Cal.3d 192, "the primary purpose of the statute [section 209, subdivision (a)] is to impose harsher criminal sanction to deter the carrying away of persons during the commission of a robbery in a manner [that] substantially increases the risk that someone will suffer grave bodily or psychic injury or even death." (*Id.* at p. 198.)

The evidence shows that removing Ezana from the area in which his parents had been bound during the home invasion and placing the child alone in the attic was not merely the movement incident to the robbery of his parents and it substantially increased the risk of harm to a then eight-year-old child. As such it supports appellant's conviction for kidnapping for extortion under section 209, subdivision (a).

In sum, we find substantial evidence on count 3, the kidnapping for extortion of Ezana.

*Sufficiency of the Evidence—Counts 27, 42 and 48*

When the court instructed the jury on counts 1 through 3, the court applied the same instructions to counts 27, 42 and 48. The verdict forms for count 27 (pre-school teacher Tiffany Chapman), count 42 (Vladimir Languev) and 48 (Tamara Languev) indicate that the jury found appellant guilty of kidnapping for extortion; and again there is no indication that the jury had an option of finding him guilty of kidnapping to get money or something valuable.[23]

Appellant asserts that the evidence here is insufficient to establish that he had the specific intent to obtain, or did obtain, Chapman's consent to relinquish her car keys, or the Languevs' consent to relinquish the clothing appellant took from their son's closet, as required for extortion. Therefore, he argues, counts 27, 42 and 48 must be reversed.

Initially, we acknowledge that the crimes of robbery and extortion are similar and sometimes difficult to distinguish. (*People v. Torres* (1995) 33 Cal.App.4th 37, 50 (*Torres*).) "Both crimes have their roots in the common law crime of larceny. Both crimes share the element of an acquisition by means of force or fear. One distinction between robbery and extortion frequently noted by courts and commentators is that in robbery property is taken from another by force or fear 'against his will' while in extortion property is taken from another by force or fear 'with his consent.' " (*Ibid.*) "Extortion does, however, require the specific intent of inducing the victim to consent to part with his or her property." (*Ibid.*)

Appellant asserts that the evidence established that he took Chapman's car keys and the Languevs' clothing at gunpoint, which is more consistent with robbery or a forcible taking, but not extortion.

---

**23** While the third amended information was written to include multiple ways of violating section 209, subdivision (a), in closing argument the prosecutor argued that appellant kidnapped Chapman and the Languevs for extortion, and, as noted, the jury was instructed only on kidnapping for extortion in regard to counts 27, 42 and 48.

Appellant argues that the facts in this case are similar to the facts in *Torres*, *supra*, 33 Cal.App.4th 37, in which the Court of Appeal found insufficient evidence of extortion.

In *Torres*, the undisputed evidence showed the defendant was a collector of " 'rent' " for a street gang; his territory included the area where the victims Argueta and Gonzales lived. One afternoon the defendant approached Argueta as he was getting into a car with some friends and asked him for money. Argueta responded he had no money and told defendant to come back later. The defendant did not attempt to prevent Argueta from leaving. (*Torres*, *supra*, 33 Cal.App.4th at pp. 50-51.)

Later that same day, defendant approached a group of men standing on a street corner. The defendant told the men he was collecting money for the gang; angry words were exchanged. The defendant forced the men up against a wall and began hitting one of the men with a gun. The defendant demanded $40 from each man, then increased his demand to $200. He told the men he wanted the money that night. The men told the defendant they had no money. The defendant told the men he did not believe they had no money because he knew they were selling marijuana. While this confrontation was taking place, Gonzales walked by on the way to move his car. The defendant pointed his gun at Gonzales and ordered him up against the wall with the other men. The defendant asked Gonzales for money and he replied that he had no money. The defendant ran his hands over Gonzales's pockets but did not put them inside Gonzales's pockets. The defendant told Gonzales to stay against the wall. (*Torres*, *supra*, 33 Cal.App.4th at p. 51.)

At this point, Argueta approached the street corner where defendant, Gonzales, and the other men were standing. Defendant stopped Argueta and asked for money. Argueta denied having any money and told defendant to come back. Defendant, who was still holding a gun, began pushing Argueta. Defendant told Argueta he wanted the money "now." Defendant grabbed Argueta by the hair, put his gun to Argueta's head and told Argueta to give him the money or he would " 'put [his] brains out.' " (*Torres*, *supra*, 33

40

Cal.App.4th at p. 51.)  Argueta replied, " 'Go ahead if you want.' "  Defendant grabbed

Argueta by the hair and placed a gun to his head, whereupon defendant shot Argueta in

the head at point-blank range and fled.  (*Ibid*.)

The *Torres* court found that the evidence described above satisfied all the elements

of an attempted robbery of Argueta and Gonzales.  The court stated that it had no doubt

the defendant intended to permanently deprive Argueta and Gonzales of their property as

demonstrated by Argueta's statement that he would give the defendant money later and

the defendant's statement to give him the money "now" or he would " 'put [his] brains

out.' "  (*Torres*, *supra*, 33 Cal.App.4th at p. 51.)  The court noted that to emphasize his

point defendant had grabbed Argueta by the hair and placed a gun to his head.  The

*Torres* court found that this evidence established the defendant's intent to take Argueta's

money by force or fear against his will.  However, at the same time, the court found that

this evidence negated the specific intent to obtain Argueta's money through consent, a

necessary element of extortion.  (*Id.* at pp. 51-52.)[24]

As to Gonzales, the *Torres* court noted that the defendant's intent to take property

from Gonzales's person was demonstrated by the fact the defendant stopped Gonzales at

gunpoint and indicated he wanted money from Gonzales.  When Gonzales stated he had

no money defendant patted Gonzales's pockets while continuing to train his gun on

---

[24] We note that the issue in *Torres* was not whether the evidence was sufficient to support a conviction for attempted extortion.  Rather, in that case a police officer testified to his opinion that the crimes committed by the defendant met the definitions of both robbery and extortion.  He opined that the defendant had committed attempted robbery, and thus implicitly opined that the defendant's killing of the second victim was first degree felony murder.  The issue on appeal was whether the failure to object to this testimony constituted ineffective assistance of counsel, and if so whether it was prejudicial.  (*Torres*, *supra*, 33 Cal.App.4th at pp. 47-48.)  The court found that counsel should have objected to the testimony, but because the evidence proved every element of attempted robbery the error was not prejudicial.  (*Id.* at pp. 49.)  The defendant argued on appeal that the evidence showed only attempted extortion, not attempted robbery.  (*Id.* at p. 42.)

Gonzales, thereby demonstrating an intent to take Gonzales's money through force against his will rather than with his consent induced by fear. (*Torres*, *supra*, 33 Cal.App.4th at p. 52.)

We have no doubt that when appellant forced his way into Secret Garden Too, swept the room with his gun pointing it at the teachers, a parent, and five infants, told everyone not to move, approached Chapman, locked eyes, and after Chapman said he could take anything he wanted, demanded her car key and threatened her that she had only three seconds to find it and left with it, he was guilty of robbery. Nevertheless, in addition, he was guilty of kidnapping for extortion before the point where he demanded her car key.

When appellant forced his way into the nursery he appeared to Chapman to be "really panicky" and "full of rage." Implicitly, appellant threatened everyone in the room by sweeping it with his gun and ordering everyone not to move. Chapman remained in the same spot and raised her hands as she watched appellant walk by the crib enclosure. She saw one baby crawling by the changing table while her infant daughter grabbed her leg. All the babies were screaming. It was at that point that Chapman told appellant to take whatever he wanted. Appellant told Chapman he wanted her car key. He became upset when she could not locate it quickly. Appellant gave her three seconds to comply. Ultimately, Chapman located her key and gave it to appellant.

Thus, at first, appellant did not demand property through the use of force or fear. Rather, first, he seized and detained Chapman by sweeping the room with his gun and ordering Chapman and the others not to move. Implicit in the sweeping of the room with a gun was appellant's threat of future harm. By seizing and detaining Chapman, all the while holding his gun, appellant obtained Chapman's consent to take whatever he wanted—i.e., with her consent through the use of force or fear. Thus, by his actions, appellant succeeded in "the obtaining of property from another, with . . . consent . . . induced by a wrongful use of force or fear . . . ." (§ 518.) It was only after that point that

42

appellant made a specific demand for Chapman's car keys and threatened her by saying that she had three seconds to find it.

Thus, there was substantial evidence to support the jury's finding on count 27—that appellant kidnapped Chapman for the purpose of extortion.

As to the Languevs, the court instructed the jury on both kidnapping for robbery and kidnapping for extortion. The jury convicted appellant of both offenses. Appellant argues that as to the kidnapping for extortion there were no threats of future harm.

After having just tried to use Chapman's car as a getaway vehicle, appellant entered the house on English Drive. Vladimir was upstairs using the computer in his son's home when he heard noises downstairs. As he walked downstairs he heard Tamara's nervous voice; it sounded as if she was begging. He saw appellant pointing a gun at him. Appellant had already bound Tamara's feet. He grabbed Vladimir's arm, threw him to the bed, and attempted to bind his hands and feet. Vladimir and Tamara remained in the bedroom for about 20 minutes. When appellant returned, he unbound their feet and directed them out at gunpoint. Appellant demanded their car keys, but Vladimir told him they were just cleaning the house of an American family and did not have car keys. After holding Vladimir and Tamara hostage for about 90 minutes, appellant began talking about changing his clothes and removed his shirt and pants. Together the three of them went through the house looking for clothes large enough to fit appellant. Vladimir handed some clothes to appellant to try to find something that fit. Eventually, they found a large T-shirt, some pants, and a pair of shoes appellant could wear. Throughout the time that appellant held the Languevs hostage he moved them around the house at gunpoint, yelling loudly at them but without making specific demands. Toward the end of the ordeal, appellant made a telephone call, after which he appeared to calm down. The ordeal ended when appellant allowed Vladimir to go out to the street to serve as a lookout, and Vladimir made his way to the waiting police officers.

43

In this instance, first, appellant demanded property through the use of force or fear—the car keys. Then, the evidence shows that appellant extorted clothing from the Languevs. After tying up the Languevs and being in the house for approximately 20 minutes, appellant demanded that his hostages give him car keys. However, Vladimir was able to offer a plausible explanation as to why they did not have them. After that, appellant continued yelling at them and moved them around the house at gunpoint until appellant calmed down and decided he should change his clothes. The Languevs offered to assist him, not in response to any direct threat, but rather because for more than 90 minutes they had been bound, yelled at, and led around at gunpoint. Once again, appellant obtained "property from another, with . . . consent . . . induced by a wrongful use of force or fear . . . ." (§ 518.)

Thus, again we find substantial evidence to support the jury's findings on counts 42 and 48—kidnapping for extortion of Vladimir and Tamara respectively.

*Sufficiency of the Evidence—Counts 41 and 47*

On count 41, the jury convicted appellant of kidnapping Vladimir Languev to commit robbery (§209, subd. (b)(1)) and in count 47 of kidnapping Tamara Languev to commit robbery (§209, subd. (b)(1)). Appellant argues that the evidence is insufficient to establish the asportation element of kidnapping, because the movement of the Languevs around their house was merely incidental to the robbery and did not increase the risk of harm to them. Further, he argues the evidence is insufficient that he intended to commit a robbery when the kidnapping commenced. For these reasons, he asserts that counts 41 and 47 must be reversed.

Section 209, subdivision (b)(1) provides, "Any person who kidnaps or carries away any individual to commit robbery . . . shall be punished by imprisonment in the state prison for life with the possibility of parole." Subdivision (b)(1) applies only "if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the

44

intended underlying offense." (§ 209, subd. (b)(2).) Appellant contends that there was insufficient evidence of asportation and insufficient evidence he intended to rob the Languevs.

*Asportation*

In *Daniels*, as noted *ante*, the court held that the offenses excluded from the aggravated kidnapping statute (§ 209) are "those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." (*Daniels*, *supra*, 71 Cal.2d at p. 1139.) Thus, the *Daniels* court sets forth a two-prong test.

As explained in subsequent cases, "[w]ith regard to the first prong, the jury considers the 'scope and nature' of the movement, which includes the actual distance a victim is moved. [Citations.] There is, however, no minimum distance a defendant must move a victim to satisfy the first prong." (*People v. Vines* (2011) 51 Cal.4th 830, 870 (*Vines*).) In addition, we consider the "context of the environment in which the movement occurred." (*People v. Rayford* (1994) 9 Cal.4th 1, 12.) "This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152.)

" ' "The second prong of the *Daniels* test refers to whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in [the underlying crime]. [Citations.] This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased." ' [Citations.]" (*Vines*, *supra*, 51 Cal.4th at p. 870.) "In the vast majority of cases, the increased risk of harm to the victim is a risk

45

of physical harm. However, this requirement can also be satisfied by a risk of mental, emotional, or psychological harm." (*People v. Power* (2008) 159 Cal.App.4th 126, 138.)

The two prongs "are not mutually exclusive but are interrelated." (*Vines*, *supra*, 51 Cal.4th at p. 870.) Thus, whether a victim's forced movement was merely incidental to the robbery "is necessarily connected to whether it substantially increased the risk to the victim." (*People v. Dominguez*, *supra*, 39 Cal.4th at p. 1152.) "[E]ach case must be considered in the context of the totality of its circumstances." (*Ibid*.) "[A] movement unnecessary to a robbery is not incidental to it . . . ." (*People v. James* (2007) 148 Cal.App.4th 446, 455, fn. 6.)

"As a general rule, 'when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him . . . his conduct generally will not be deemed to constitute [aggravated kidnapping].' [Citation.]" (*People v. James*, *supra*, 148 Cal.App.4th at pp. 455-456.)

This case is similar to *People v. Leavel* (2012) 203 Cal.App.4th 823 (*Leavel*). In *Leavel*, the 67-year-old female victim heard noises and came downstairs to find the defendant, unclothed, in her kitchen. The victim froze and then backed away. The defendant slapped his hand over her mouth and knocked her to the ground. He told the victim he would not hurt her if she cooperated with him. The defendant told the victim about his " 'sad life,' " and she gave him $70 from her purse. Then the defendant looked in the purse and took her cellular telephone and cigarettes. The defendant told the victim they were going to smoke together and walked her to her bedroom. While in the bedroom, the defendant found a pistol in the night table, which he took. Next, he told the victim he was hungry and forced her back to the kitchen. She gave him ham. The defendant said it was too salty and ordered the victim to go to the bathroom to flush it down the toilet. After that he ordered the victim to go to her office where he took a digital camera, a pen, and a towel. The defendant forced the victim to go outside where he retrieved his clothes, then forced her back into the living room where he got dressed.

46

The defendant made a telephone call, then left the house about 50 minutes after the victim discovered him. (*Id*. at pp. 826-827.)

On appeal, the Leavel court rejected the defendant's challenge to the sufficiency of the evidence in support of his conviction of kidnapping for robbery. Just as in this case, the defendant asserted that the movement of the victim around her own home was insufficient to prove the asportation element. (*Leavel*, *supra*, 203 Cal.App.4th at p. 834.) The court found "the evidence supports a finding that Leavel's forcible movement of [the victim] from the kitchen to her bedroom was unnecessary to facilitate a robbery." (*Id*. at p. 835.) The court went on to say that "even if Leavel's forcible move of [the victim] to the bedroom was in furtherance of the robbery, the jury could find his forcible move of her from the bedroom to the kitchen and other locations was not." (*Ibid.*) Finally, the court found "substantial evidence also supports a finding that the forcible movements increased the risk of harm to [the victim]. She was 69 years old when the ordeal occurred, and Leavel moved her around by grabbing her neck and arm. Most of the movements occurred when he was carrying her loaded gun. [The victim] had disconnected the phones on Leavel's order and she was cooperative with him. He could have secured her in one spot in the home and left her alone while he searched the house and escaped with the loot. Leavel was six feet tall and he weighed about 250 pounds. He had no cause to manhandle [the victim] to achieve his robbery objective." (*Id*. at p. 836.)

Similarly, in this case, appellant, a very large man, entered the home on English Drive where he found Tamara and Vladimir, both in their 60's and obviously non-English-speaking. Appellant was armed with a gun, which he pointed at Vladimir as soon as he saw him. Appellant grabbed Vladimir's arm and threw him onto the bed. He bound both victims with cloth, towels, and shoelaces. After about 20 minutes, appellant led them from the bedroom where he had left them. Vladimir thwarted appellant's initial request to obtain keys for a getaway car by denying he had keys. During the next approximately 90 minutes, appellant led the Languevs around the house at gunpoint to

47

the kitchen, the bedroom, and various other rooms, sometimes looking for clothing and sometimes for no apparent reason. Throughout the time he held them captive, appellant was hostile and threatening. He shouted at his elderly victims and pointed the gun at them. Appellant released Vladimir only when the police sirens were no longer audible; appellant wanted Vladimir to look outside for the police. When Vladimir left the house, he was afraid to go to the police because, as far as Vladimir knew, appellant continued to hold Tamara hostage. Tamara was so traumatized that after her escape, she was treated by paramedics.

Little, if any, of the movement of the Languevs within the house was necessary for appellant to obtain property. Initially, appellant bound and confined the Languevs in the bedroom for about 20 minutes, which was ample time for him to look through the house for clothing or other items he wanted to take. When he came to the bedroom to get the Languevs, he demanded car keys, but did not obtain them. From that point on, none of the movement was incidental to the robbery. The ongoing movement at gunpoint increased the risk of harm to the elderly Languevs, both of whom had medical conditions. Even when given an opportunity to flee to the police, Vladimir was afraid to take advantage of the situation. The evidence of asportation in this case is comparable to that found sufficient in *Leavel*, *supra*, 203 Cal.App.4th at pp. 835-836. The evidence amply supports the conclusion that the movement of the Languevs was not incidental to the robbery, and greatly increased the risk of harm to the elderly couple.

*Intent to Rob*

To be guilty of aggravated kidnapping the evidence must show that appellant intended to rob the Languevs at the time he held or detained them. (*People v. Curry* (2007) 158 Cal.App.4th 766, 779.) "[A] kidnaping for the purpose of robbery may be committed even when the robbery itself fails . . . ." (*People v. Beaumaster* (1971) 17 Cal.App.3d 996, 1007.) It does not matter whether appellant intended to commit a robbery when he entered the house at 118 English Drive; what matters is whether he

48

intended to rob the Languevs when he kidnapped them. "Criminal intent will rarely be shown by direct evidence and must frequently be inferred from a defendant's conduct." (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1380.)

Here, to infer appellant's intent when he kidnapped the Languevs, we look to appellant's conduct a short time before he entered the English Drive home—what he did at Secret Garden Too. There, upon entering the nursery, when Chapman offered appellant anything he wanted, he demanded her car key. He was not, however, able to use her key to start the car. Not long after he fled from Secret Garden Too, appellant entered the house at 118 English Drive.

Appellant asserts that it is likely that when he entered the house he did so to avoid being apprehended by the police. We acknowledge that is a possibility—he entered the home sometime after 12:00 noon on a weekday when it would have been possible no one was home. Nevertheless, that is not the issue. It is reasonable to infer that once appellant realized the house was occupied, he intended to complete what he had failed to achieve at Secret Garden Too—obtain a getaway car. That appellant failed to achieve his objective because Vladimir denied having car keys is irrelevant on the issue of his intent. (*People v. Beaumaster*, *supra*, 17 Cal.App.3d at p. 1007 [kidnapping for the purpose of robbery may be committed even when the robbery itself fails].)

In sum, we find sufficient evidence to establish the asportation element of kidnapping and sufficient evidence that appellant intended to commit a robbery when the kidnapping commenced.

*Sufficiency of the Evidence—Counts 33, 34, 35, 36, 37 and 39*

The jury convicted appellant in counts 33, 34, and 35 of the attempted false imprisonment for protection (§§664/210.5) of Monica Rocha, a teacher at the Secret Garden Too (count 33); Kristin Van Kley, Hayden's mother (count 34); and four-and-a-half-month-old Hayden (count 35); and in counts 36 through 39 of the false imprisonment for protection of the infants who were in the nursery when appellant ran

49

into the room—nine-month-old Anahi (count 36), eight-month-old Fayana (count 37), eight-month-old Dean (count 38), and six-month-old C.J. (count 39).

Appellant argues that the evidence here is insufficient to establish that he falsely imprisoned the infant children, or that he attempted to falsely imprison Rocha, Van Kley, or Hayden. As to the false imprisonment counts of the infants he asserts his conduct was directed solely at Chapman and he did not compel any of the babies to stay where they did not wish to stay, or to go where they did not wish to go.

Further, as to the attempted false imprisonment of Rocha, Van Kley and Hayden, appellant argues that the evidence is insufficient to establish that he specifically intended to falsely imprison Rocha, Van Kley, or Hayden for purposes of protection. Moreover, he asserts that the evidence is insufficient to establish that he took a direct step toward compelling Rocha, Van Kley, or Hayden to remain where they did not wish to remain, or to go where they did not wish to go. Appellant asserts that in fact, Rocha, Van Kley, and Hayden left the room within *two seconds* of the time he entered the room. They went exactly where *they* wanted to go—away from him. Appellant contends that he did not restrain, or even attempt to restrain, Rocha, Van Kley, or Hayden because he made no effort whatsoever to prevent them from leaving, and once they left, he made no attempt to get them back.

*False Imprisonment for Protection of the Infants*

"False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) In this context, a victim's personal liberty is violated when he or she is " ' "compelled to remain where he does not wish to remain, or to go where he does not wish to go." ' [Citations.]" (*People v. Reed* (2000) 78 Cal.App.4th 274, 280.) "It is the restraint of a person's *freedom of movement* that is at the heart of the offense." (*Ibid.*) The victim need not be confined in an enclosed space. (*People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1357 (*Dominguez*).) "False imprisonment may be committed by words or acts and merely by operation upon the will of the individual or by personal

50

violence, or both. [Citations.]" (*Id.* at pp. 1360-1361; see *People v. Zilbauer* (1955) 44 Cal.2d 43, 51.)

"False imprisonment is a misdemeanor unless it is 'effected by violence, menace, fraud, or deceit,' in which case it is a felony." (*People v. Wardell* (2008) 162 Cal.App.4th 1484, 1490 , quoting § 237, subd. (a).) " 'Force is an element of both felony and misdemeanor false imprisonment. Misdemeanor false imprisonment becomes a felony only where the force used is greater than that reasonably necessary to effect the restraint. In such circumstances the force is defined as "violence" with the false imprisonment effected by such violence a felony.' [Citation.]" (*People v. Castro* (2006) 138 Cal.App.4th 137, 140.) "Menace is a threat of harm expressed or implied by words or act. [Citation.]" (*Dominguez*, *supra*, 180 Cal.App.4th at p. 1359; see *People v. Reed*, *supra*, 78 Cal.App.4th at p. 280.) In this case, the jury was instructed that menace "means a verbal or physical threat of harm. The threat of harm may be express or implied."

"Every person who commits the offense of false imprisonment, as defined in Section 236, against a person for purposes of protection from arrest, which substantially increases the risk of harm to the victim, or for purposes of using the person as a shield is punishable by imprisonment pursuant to subdivision (h) of Section 1170 for three, five, or eight years." (§ 210.5)

The court instructed the jury that to find appellant guilty of false imprisonment for protection, they had to find, among other things, that he "made the other person stay or go somewhere against that person's will. . . ." Appellant asserts that there was no evidence he falsely imprisoned anyone other than Chapman. He argues that he did not compel any of the babies to stay where they did not wish to stay, or to go where they did not wish to go. None of the babies were made to stay or go anywhere against their will. Furthermore, he argues that he did not use any force against the babies.

51

The amount of force required to constitute felony false imprisonment of an infant or young child was addressed in *Dominguez*, *supra*, 180 Cal.App.4th at pp. 1357-1358. The *Dominguez* court noted that in *In re Michele D.* (2002) 29 Cal.4th 600, (*Michele D.*) the court had addressed the issue of the amount of force required to constitute a kidnapping of an infant or young child. (*Dominguez*, *supra*, at p. 1357.) As the *Dominguez* court explained it, "In *Michele D.*, the minor, her friend, and the friend's infant child were in a store. When the minor and her friend were briefly separated, the minor took the infant without permission. The minor was found by the juvenile court to have violated section 207, subdivision (a), by kidnapping the infant. The juvenile court also found the infant was under the age of 14 and was kidnapped with the intent to permanently deprive her parent of custody under section 667.85. (*Michele D.*, *supra*, at pp. 603-605.)" (*Ibid.*)

The *Dominguez* court noted that "[t]he Supreme Court 'granted review to resolve the issue of what quantum of force, if any, must be shown to sustain a conviction for kidnapping when the victim is an unresisting infant or child.' (*Michele D.*, *supra*, 29 Cal.4th at p. 603.) The court held 'that the amount of force required to kidnap an unresisting infant or child is simply the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent.' (*Ibid.*)" (*Dominguez*, *supra*, 180 Cal.App.4th at p. 1357.)

"In the ordinary kidnapping case, the amount of force required is 'something more than the quantum of physical force necessary to effect movement of the victim from one location to another.' (*Michele D.*, *supra*, 29 Cal.4th at p. 606.) However, even if force is not used in the conventional sense, a wrongful intent in carrying off an infant is sufficient to constitute force for purposes of the kidnapping statute. (*Ibid.*) 'The fact that the Legislature may not have considered every factual permutation of kidnapping, including the carrying off of an unresisting infant, does not mean the Legislature did not intend for

52

the statute to reach that conduct.' (*Ibid.*)" (*Dominguez*, *supra*, 180 Cal.App.4th at p. 1357.)

"In reaching its conclusion, the *Michele D.* court referred to its decision in *People v. Oliver* (1961) 55 Cal.2d 761 (*Oliver*), in which the defendant was convicted of kidnapping under facts showing the victim, a baby, went willingly with the defendant. In order to avoid the possibility of an unjust result if the kidnapping statute were given a literal interpretation, the Supreme Court held the statute should be given a 'sensible construction,' and the element of force is established 'if the taking and carrying away is done for an illegal purpose or with an illegal intent.' (*Id.* at p. 768.)" (*Dominguez*, *supra*, 180 Cal.App.4th at pp. 1357-1358.)

"*Michele D.* noted that dicta in *Parnell v. Superior Court* (1981) 119 Cal.App.3d 392, 402-403, footnote 3 (*Parnell*) and *People v. Rios* (1986) 177 Cal.App.3d 445, 451 (*Rios*) had interpreted *Oliver* as standing for the proposition that the 'force requirement, like the consent requirement, is relaxed or eliminated in a kidnapping that involves an infant or a small child.' (*Michele D.*, *supra*, 29 Cal.4th at p. 608.) The Supreme Court held 'the *Parnell-Rios* construction of *Oliver* has merit because the consent and force elements of kidnapping are clearly intertwined. [Citation.] [And if, as in *Oliver*,] the child victim went "willingly" with defendant, the implication is that force was not used against him. Thus, our holding in *Oliver*—that, where the victim by reason of youth or mental incapacity can neither give nor withhold consent, kidnapping is established by proof that the victim was taken for an improper purpose or improper intent—was reasonably extended in *Parnell* and *Rios* to encompass situations in which, because of the victim's youth, there is no evidence the victim's will was overcome by force.' (*Michele D.*, *supra*, at p. 609.)" (*Dominguez*, *supra*, 180 Cal.App.4th at p. 1358.)

" 'That said, it remains true that no California case has yet defined the quantum of force necessary to establish the force element of kidnapping in the case of an infant or small child. We formulate that standard as follows: the amount of force required to

kidnap an unresisting infant or child is simply the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent.' (*Michele D.*, *supra*, 29 Cal.4th at p. 610 . . . .)" (*Dominguez*, *supra*, 180 Cal.App.4th at p. 1358.)

The *Dominguez* court assumed "the discussion of force in the context of a kidnapping prosecution in *Michele D*. applies equally to the force requirement of false imprisonment." (*Dominguez*, *supra*, 180 Cal.App.4th at p. 1358.)

Appellant argues that he did not "touch or move the babies and he certainly he [*sic*] did not move them a "substantial" distance." While the court in *Dominguez*, *supra*, 180 Cal.App.4th at pages 1358-1359, found that the movement of an unresisting four-year-old girl was sufficient to support the conviction for false imprisonment, we are not convinced that the *Dominguez* court intended to impose that as a minimum evidentiary requirement for false imprisonment of an infant.

Furthermore, this case is distinguishable from *Dominguez*. In this case, the force was used to restrain the movement of the infants, not to move them. It appears that appellant takes the position that because nothing he did was directed toward the infants, the evidence does not support an inference that he intended to restrain them. The evidence, however, supports the inference that he intended to restrain everyone in the room when he swept the room with a gun and told the occupants not to move. That the infants could not understand what appellant was saying is not relevant. Of the four infants in the room with Chapman, only two were mobile and none had the mental capacity to flee or consent to staying in the room. "[F]or the purpose of a felony false imprisonment conviction under sections 236 . . . when the victim is a child of tender years, [it is] sufficient if the crime is 'effected' by 'violence, menace, fraud, or deceit' directed to the custodial parent [in this case custodial adult Chapman] rather than to the child [himself or] herself." (*Rios*, *supra*, 177 Cal.App.3d at p. 450.)

54

Alternatively, appellant argues that the evidence does not show that he held the babies hostage, which required holding them " 'for purposes of using the person as a shield,' " and thus his conduct did not amount to false imprisonment for protection. Appellant relies on *People v. Gomez* (1992) 2 Cal.App.4th 819 (*Gomez*) (disapproved on other grounds in *People v. Lewis* (2008) 43 Cal.4th 415, 519, fn. 29) in support of his position.

In *Gomez*, *supra*, 2 Cal.App.4th 819, the court defined a hostage as " '[a] person held as a pledge that certain terms will be fulfilled.' " (*Id*. at p. 825, fn. 3.) However, *Gomez* involved a situation where a hostage was tied up and abandoned and the defendant was not arrested until much later. The court in *Gomez* discussed the risk of "imminent" arrest and reversed the section 210.5 conviction. (*Gomez*, *supra*, at pp. 825-826.)

As noted *ante*, under section 210.5, the offense of false imprisonment for protection occurs when the perpetrator falsely imprisons "a person for purposes of protection from arrest, which substantially increases the risk of harm to the victim, or for purposes of using the person as a shield . . . ." In *Gomez*, the court found that the statutory language "is unambiguous and plainly means there must be a threat or risk of imminent arrest." (*Gomez*, *supra*, 2 Cal. App.4th at p. 825.) The court held that the evidence did not support the inference that the defendant tied up the victim to prevent his imminent arrest. (*Id*. at pp. 825-826.)

In contrast to the facts in *Gomez*, in this case appellant had just escaped from custody by shooting a deputy sheriff in the head with a taser and had fired a shot at a person from the MRI center. Most certainly, appellant knew that he faced imminent arrest, and it is reasonable to infer that during the brief period in which he held the babies hostage at gunpoint he substantially increased the risk of harm to them; and we have no doubt that if the police had arrived he would have used everyone as a hostage for purposes of protection from arrest. That appellant quickly changed his mind and decided

55

instead to try to flee in Chapman's car does not undermine the evidence showing he falsely imprisoned hostages for the purpose of protection from imminent arrest.

*Attempted False Imprisonment of the Adults and Hayden*

Appellant argues that the evidence is insufficient to support his convictions for the attempted false imprisonment for protection of Rocha (count 33), Van Kley (count 34), and Hayden (count 35). Appellant contends that the evidence is insufficient for two reasons: one, because the evidence was lacking that he intended to falsely imprison for protection anyone at Secret Garden Too; and two, because the time he, Rocha, Van Kley, and Hayden were in the room together was insufficient to establish an attempt.

As appellant points out, the evidence established that Van Kley went to the Secret Garden Too to pick up her son Hayden. As Rocha was handing Hayden to Van Kley, appellant came up the ramp waving a gun and began ramming the door. He broke through the door and said, "nobody move." Van Kley testified that "one second" later she opened the door, ran outside, and hid. Rocha ran out of the room within two seconds, behind Van Kley, carrying Hayden. They left immediately.

An attempt to commit a crime consists of a specific intent to commit the crime and a direct but ineffectual act done toward its commission. (*People v. Siu* (1954) 126 Cal.App.2d 41, 43.) Commission of an element of the underlying crime other than formation of intent to do it is not necessary. (*People v. Dillon* (1983) 34 Cal.3d 441, 453.) Although mere preparation such as planning or mere intention to commit a crime is insufficient to constitute an attempt, acts that indicate a certain unambiguous intent to commit that specific crime and which are in themselves an immediate step in the present execution of the criminal design will be sufficient. (See *People v. Siu*, *supra*, at p. 43; CALCRIM No. 460)

Once appellant swept the room with his eyes and gun and told everyone not to move, the only act that remained to complete the substantive crime was the victims' submission to the threats of harm. The fact that Van Kley and Rocha, with baby Hayden

in her arms, took the risk of fleeing immediately is what made this an attempted false imprisonment rather than a completed offense. That these victims were only in the room for two seconds is of no moment. Since we have rejected appellant's argument *ante* that the evidence was lacking that he intended to falsely imprison for protection anyone at Secret Garden Too, we find substantial evidence to support the jury's finding that appellant attempted to falsely imprison Rocha, Van Klay, and Hayden.

*Sufficiency of the Evidence—Count 9*

The jury convicted appellant in count 9 of receiving stolen property, which was identified in the information and verdict as "jewelry, rings, necklaces, bracelets, jewelry case." In closing argument, the prosecutor identified these items as belonging to the Anleys and indicated that they were the items found in appellant's pocket.

Appellant asserts that his conviction for receiving this stolen property must be reversed and dismissed under the "Double Jeopardy" provisions of the Fifth Amendment to the United States Constitution and Article I, Section 15 of the California Constitution, because, absent two exceptions that do not apply here, a thief cannot be convicted of receiving the property he stole. Respondent concedes this issue, and we agree.

The jury convicted appellant of robbery (§ 211) in count 4 and residential burglary (§ 459) in count 5. Both counts involved the taking of personal property from either the Anley residence or the persons of Teodros and Patricia. At the time of his arrest, items stolen during the Anley home invasion were found in appellant's pocket. Appellant was detained and arrested immediately after the crimes, indeed while Sheriff's deputies were still at the Anleys' home. When appellant was detained, Deputy Huntsman searched him. In the pocket of appellant's pants the deputy found several pieces of assorted jewelry, including a gold necklace, a ring belonging to Teodros's father, and a small red jewelry pouch that belonged to Patricia. The jewelry was identified by the Anleys even before appellant was transported to the sheriff's department for booking.

57

In *People v. Jaramillo* (1976) 16 Cal.3d 752, the Supreme Court applied the rule that a defendant cannot be convicted of both stealing and receiving the stolen property, in the context of a conviction for violating Vehicle Code section 10851. (*People v. Jaramillo*, *supra*, at p. 757.) The court found that "[W]hen an accused is convicted of [theft], which *necessarily* requires a finding that the accused intended to steal, he cannot also be convicted of receiving that same stolen property." (*Id*. at pp. 758.) There are two exceptions to this principle: (1) when the act of receiving is completely divorced from the theft, as when a thief disposes of property and later in a separate transaction receives it again; and (2) when the thief is a co-conspirator of the receiver. (*People v. Strong* (1994) 30 Cal.App.4th 366, 371, fn. 5.) Under the facts of this case, neither exception applies here. The facts support the conclusion that appellant possessed the stolen property solely as the thief, waiting to dispose of it, not as a "fence" holding the property for the thief.

Accordingly, we must reverse appellant's conviction on count 9.

*Admission of Gang Evidence and Threat Evidence*

Before trial, the court granted a defense motion to sever the gang charges, counts 52 and 56. Earlier, in discussing defense counsel's motion, the trial court noted, inter alia, that the gang charges had a "limited place in connection with all of the other charges in the case" and that there was "the potential to prejudice" appellant. Pursuant to the prosecution's motion to admit gang evidence, and over defense objections, the court admitted the following gang evidence.

The prosecution called Sergeant Morgan Chappell to testify.[25] He testified that in the summer of 2011, the Apple Hill murder trial was going on and Detective Pisturino

---

**[25]** Although the prosecution did not seek to qualify Sergeant Chappell as a gang expert, he testified that as part of his assignment he testified as an expert on Norteño gangs "probably 30" times.

58

was the lead detective on the case. The case involved some Norteño gang members murdering a young man in Watsonville. While Detective Pisturino was a gang detective, he received a kite and letter from appellant. Sergeant Chappell explained that a "kite" is a small note an inmate writes that usually contains information designated for the recipient only. He explained that kites are used most frequently by Norteño gang members. In the kite, appellant offered to set up a murder suspect, to obtain a confession from a member of the Nuestra Raza prison gang, whom he referred to as a "bro." In Sergeant Chappell's opinion, the consequence of offering to snitch on a "bro" would be death.[26] Also, if fellow gang members found out he sent this kite to law enforcement, appellant's life would be in jeopardy. The prosecutor had Sergeant Chappell explain the meaning of certain things written in the kite. For example, when appellant mentioned the "policies and procedures" in his kite, he could have been referring to the code of conduct Norteños are expected to follow while in custody. The questions in the kite appeared to refer to a "seven on seven," which is the way Norteños do miniature background checks on each new person that comes into the jail or prison to make sure the person is not a snitch or rival gang member. The "seven on seven" asks the new arrival seven basic questions, so the Norteños can conduct the background check. The reference to an "IR"—incident report, means that the Norteño gang member in charge of the cell block asked another Norteño gang member to write an incident report, and the latter would need to do that. Sergeant Chappell explained to the jury the relationship between the Norteños, the Nuestra Familia, and the Nuestra Raza and how the latter two prison gangs are related to the Norteño street gang. Appellant's kite mentioned the murder of Leonardo Barajas. Sergeant Chappell said he was familiar with the murder of Barajas in

---

[26] Sergeant Chappell told the jury that "[a] bro and the Nuestra Raza . . . is a prison gang but it's also organized crime. They function inside and outside of prison and they are very dangerous, very violent . . . ."

59

2008. He explained that Barajas dropped out of the Norteño gang, and leaving the gang cost him his life. Barajas had agreed to testify against a Norteño associate regarding the assault of Rico Hayes.

Before Sergeant Chappell testified, the court admitted evidence about appellant's tattoos—a stipulation that appellant's abdomen was photographed on March 27, 2009, and again on September 27, 2011. In the later photograph appellant had a tattoo of an upper case "N" and a portion of a letter to the right of it, a tattoo on his abdomen to the left of the "N" showing upper case "OR" and "T" and another photograph of appellant's left hand showing a new tattoo that read "oppression breeds resistance. Resistance brings freedom."[27]

In addition to the gang evidence, Teodros Anley testified that in 2010 he had been subpoenaed to testify. On October 5, 2010, he received a letter at his home address with a return address from Santa Cruz County Jail. Inside was a threatening letter created from items cut from newsprint. The letter contained Patricia's social security number. The first line contained the word "dead" and the second had the phrase "memorial service." Teodros felt as if the sender was trying to keep them from testifying by making death threats. The parties stipulated that the set of clippings sent to the Anleys was an inmate letter from the county jail and was in the type of envelope typically issued by inmates. Further, the parties stipulated that a further readiness conference had been set for September 30, 2010, with trial in the Anley matter set for October 18, 2010.

In addition to the foregoing, Jyler Raines testified that during his first year in jail he received a letter from appellant. The letter had a friendly tone, but it stated that appellant knew Raines had talked to the police and told him that he should stop. Raines

---

**27** Although the jury heard the evidence that appellant had the tattoo on his hand, the court did not admit the photograph. The court refused to admit the photograph because the tattoo was not "clearly [a] gang-related tattoo."

took that to mean that appellant did not want him to testify.  In addition, Raines received a letter from Makuria Banks, a girl he had known in high school but had not had contact with in several years.  Banks told Raines to "man up and not testify against Maurice."  He took the letter as a threat because it said that if he testified his criminal "paperwork" would be given to other inmates and he would be in danger.  On the day of the escape, but before appellant was caught, a search of his cell uncovered a letter to appellant from "Makuria."

Raines testified that he was a maximum security inmate because he "rolled himself up."  Other inmates told Raines they had his paperwork indicating that he was testifying.  They told him to get off the yard.  It was not really a threat; they just asked Raines to leave so nothing bad would happen.  Raines informed an officer and was moved to protective custody.

In September 2012, Raines said that he was put in the same transport van as appellant.  By that point, Raines had already agreed to testify against appellant.  Appellant told him that everything was Raines's fault, and Raines was responsible for taking appellant away from his family.

The court instructed the jury at the time of Raines's testimony that it could not consider Raines's testimony for the truth of the matter but only to assess Raines's state of mind and credibility in testifying.

Appellant argues that his trial was rendered fundamentally unfair, depriving him of due process (U.S. Const. 5th & 14th Amends.; Cal. Const., art. I, §§ 7, 15).  He asserts that the admission of the gang evidence and the other evidence portrayed him as a violent, threatening person.  He asserts that the gang evidence was irrelevant and inadmissible under Evidence Code section 352; and the other evidence, involving Raines, should have been excluded under Evidence Code section 352.  He contends that the erroneous admission of this evidence, individually or combined, was prejudicial.

61

"California courts have long recognized the potentially prejudicial effect of gang membership.  As one California Court of Appeal observed:  'It is fair to say that when the word "gang" is used in Los Angeles County, one does not have visions of the characters from the "Our Little Gang" series.  The word gang . . . connotes opprobrious implications. . . .  [T]he word "gang" takes on a sinister meaning when it is associated with activities.'  [Citation.]  Given its highly inflammatory impact, the California Supreme Court has condemned the introduction of such evidence if it is only *tangentially* relevant to the charged offenses.  [Citation.]  In fact, in cases not involving gang enhancements, the Supreme Court has held evidence of gang membership should not be admitted if its probative value is minimal.  [Citation.]  'Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.'  [Citation.]"  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.)

"Thus, as general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative.  [Citation.]  Consequently, gang evidence may be relevant to establish the defendant's motive, intent or some fact concerning the charged offenses other than criminal propensity as long as the probative value of the evidence outweighs its prejudicial effect.  [Citations.]  'Evidence of the defendant's gang affiliation . . . can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.  [Citations.]'  [Citation.]  Nonetheless, even if the evidence is found to be relevant, the trial court must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury.  [Citations.]"  (*People v. Albarran*, *supra*, 149 Cal.App.4th at pp. 223-224.)  Evidence of defendant's gang membership, although relevant to motive or identity, creates a risk the jury will improperly infer that

defendant has a criminal disposition and is therefore guilty of the charged offense and thus must be carefully scrutinized.  (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.)

The People argue that the gang evidence introduced in this case was so minor and tangential that appellant's argument in this court—that its admission was erroneous and prejudicial—is longer than all the testimony and stipulations regarding that evidence presented to the jury at trial.  Further, the People point out that the prosecutor did not argue to the jury that appellant was a gang member or participated in gang activities.  Rather, the gang evidence was introduced for two purposes:  (1) to support Raines's credibility for testifying in the face of threats and (2) to show appellant's consciousness of guilt when he wrote to a gang detective offering to set up a Norteño gang member in an unsolved homicide.  We are not persuaded.

Since the gang charges in this case were severed, the gang evidence in this case had no connection to the crimes with which appellant was charged.  Further, the "kite" evidence could have been explained without any reference to kites being used primarily by Norteño gang members; and the evidence of the relationship between the Norteños, the Nuestra Familia, and the Nuestra Raza and how the latter two prison gangs are related to the Norteño street gang and how violent they are, along with the evidence of appellant's tattoos showing that he had gained a gang tattoo, was simply irrelevant.  The gang evidence had no relevance, so much so that it raised the distinct potential to sway the jury to convict appellant regardless of his actual guilt.

That being said, we turn to the issue of prejudice.  Appellant claims that the admission of this evidence was so serious as to violate his federal constitutional rights to due process, rendering his trial fundamentally unfair.  (See *Estelle v. McGuire* (1991) 502 U.S. 62, 70; *People v. Partida* (2005) 37 Cal.4th 428, 439, [the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the *trial fundamentally unfair*].)  In the case of a deprivation of federal due process, reversal is required unless the State can prove beyond a reasonable doubt that the error did not

contribute to the verdict. (See *People v. Boyette* (2002) 29 Cal.4th 381, 428 [*Watson* standard[28] applies to prejudicial-error analysis for errors of state law, while beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18 applies to similar analysis for federal constitutional errors].)

In this case the standard of review is largely beside the point because the evidence against appellant was so overwhelming. In closing argument, trial counsel conceded that appellant was guilty of receiving stolen property from the Anleys (count 9), conceded counts 14-23 regarding the escape and assault on Deputy Bramanti, acknowledged that appellant was guilty of counts 26, 40 and 51 involving the burglaries at Secret Garden Too and the two houses on English Drive, conceded guilt for robbery and attempted carjacking of Tiffany Chapman, and admitted that appellant had unlawfully possessed a firearm. Counsel made a weak argument that appellant did not participate in the burglary or the other offenses at the Anley residence. He argued that Raines was not credible, but acknowledged that Raines could be believed, in which case appellant was guilty of burglary and home invasion robbery.

Further, that the jury decided this case on the facts and not on emotions is quite apparent because it acquitted appellant on counts 10 and 11 (§§ 136.1, subd. (c)(1), 137, subd. (b))—the counts regarding the threats directed to the Anleys. If the jury had simply been inflamed by the gang evidence it would have convicted appellant on the threat counts. Accordingly, we are convinced beyond a reasonable doubt that the error did not contribute to the verdict.

As to the other evidence with which appellant takes issue, we find no error in its admission.

Appellant concedes that evidence a witness is afraid to testify, or is fearful of retaliation, is relevant to the credibility of that witness and is therefore admissible.

---

[28] *People v. Watson* (1956) 46 Cal.2d 818.

(*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368.)  However, citing *People v. Williams* (1997) 16 Cal.4th 153, 200-201 (*Williams*), he argues that the letter allegedly written by Banks, the interaction Raines allegedly had with someone during a jail transport whom he believed to be a Norteño gang member, and his testimony about some other unidentified inmate having "papers" on him, was inadmissible and should have been excluded under the general rule that evidence of an attempt by a third person to suppress evidence is inadmissible against a defendant when the attempt did not occur in the defendant's presence and the defendant did not authorize the attempt.

Appellant's reliance on *Williams* is misplaced.  In that case the issue was whether evidence of third party threats was admissible against the defendant as evidence of the defendant's consciousness of guilt.  (*Williams*, *supra*, 16 Cal.4th at pp. 200-201.)  Here, the evidence of third party threats was admitted only as to Raines's state of mind, not for appellant's consciousness of guilt.  Admission of the testimony was not fundamentally unfair.

Here, the court admitted two pieces of evidence of threats made by appellant to Raines—his oral statement in the jail transport van and a letter he sent to Raines from the jail.  Appellant argues that the evidence was inadmissible as more prejudicial than probative under Evidence Code section 352.  We disagree.  As "decisions of this state have long recognized [citations], a threat made by a defendant against a prospective prosecution witness, with the apparent intention of intimidating the witness, is properly admitted because an accused's efforts to suppress evidence against himself indicate a consciousness of guilt."  (*Vines*, *supra*, 51 Cal.4th at pp. 866-867.)

Finally, assuming for the sake of argument that the court abused its discretion under Evidence Code section 352 in admitting the threat evidence, we find no prejudice under any standard of review for the same reasons outlined *ante*.

*Loss of Presentencing Credits*

Over appellant's objection and the court's denial of a request for an evidentiary hearing, the prosecutor recommended, and the trial court agreed, that based on numerous acts of misconduct in jail appellant should be denied presentence conduct credits under section 4019, subdivision (c). On appeal, appellant asserts that he was denied his due process rights to contest the denial of credits. The People agree, but only to a limited extent. We agree that a remand is necessary.

Under section 4019, certain prisoners are entitled to good behavior credit for time spent in county jail, "unless it appears by the record that the prisoner has not satisfactorily complied with . . . [jail] rules and regulations . . . ." (§ 4019, subds.(a) & (c).) Conduct credit for presentence custody is credited to the defendant's term of imprisonment "in the discretion of the court imposing the sentence." (§ 2900.5, subd. (a).)

Nevertheless, a court "must afford a defendant due process—notice and a fair hearing—in determining the amount of conduct credit to which he or she is entitled. (*People v. Duesler* (1988) 203 Cal.App.3d 273, 276-277.)"[29] (*People v. Lara* (2012) 54 Cal.4th 896, 901.)

In this case, the court relied on several incident reports setting forth acts of misconduct appellant allegedly committed in jail, which were attached to the prosecutor's sentencing memorandum.[30] Defense counsel was not served with a copy of the sentencing memorandum before the hearing.[31]

---

[29] In *People v. Duesler*, *supra*, 203 Cal.App.3d at p. 277, the court held that "before a sentencing court may withhold conduct credits, the defendant is entitled to prior notice and an opportunity to (1) rebut the findings of his jail violations, and (2) present any mitigating factors." In part, *Duesler* relied on *Wolff v. McDonnell* (1974) 418 U.S. 539, 563-566, which sets forth the minimal due process requirements for prison disciplinary proceedings.

[30] There are some reports attached to the probation officer's report. However, the probation officer did recommend that appellant receive some conduct credits.

[31] At the sentencing hearing, the prosecutor explained to the court that she had not (continued)

66

In general, the probation report is the appropriate vehicle for notifying a defendant that his or her conduct credits are in jeopardy by suggesting or recommending withholding of those credits. (*People v. Duesler*, *supra*, 203 Cal.App.3d at p. 277.) In this case, as noted, the probation report referenced some jail incidents, but did recommend that appellant receive some conduct credit. The court based its withholding of credits on the prosecutor's recommendation and reports attached to the prosecutor's sentencing memorandum of which appellant did not have notice. Thus, appellant was not notified that presentence credits would be an issue at sentencing and thus was not afforded due process. Due process in the award of credits "entails sufficient notice of the facts that restrict his [or her] ability to earn credits and, if he [or she] does not admit them, a reasonable opportunity to prepare and present a defense." (*People v. Lara*, *supra*, 54 Cal.4th at p. 906.)

Appellant was denied this opportunity. Accordingly, we conclude that appellant is entitled to a limited remand in order to have notice of and an opportunity to contest the withholding of his presentence conduct credits. Appellant is entitled to a new sentencing hearing, upon proper notice, limited to the issue of presentence conduct credits.

Finally, appellant raises issues with the court's oral pronouncement of judgment being in conflict with the abstract of judgment. Specifically, he contends that a three-year, four-month sentence for the gun enhancement of count 26 as reflected in the abstract of judgment was not imposed by the court during the oral pronouncement of judgment. Further, during the oral pronouncement of judgment the court calculated his determinate sentence as 138 years, four months, consecutive to six life terms of seven years to life (42 years). Defense counsel calculated 135 years, 10 months. The clerk's

received back a file-stamped copy of the sentencing memorandum, but would provide a copy to counsel once she did. We infer from this that defense counsel had not received a copy of the sentencing memorandum.

minute order from the sentencing hearing reflects a determinate sentence of 134 years, two months, consecutive to 42 years. The amended abstract of judgment reflects a determinate sentence of 140 years, two months, consecutive to 42 years, for a total of 182 years, two months. Appellant requests a remand for a determination of his determinate sentence.

Since we must remand this case for a new sentencing hearing, the court can clarify these issues on remand. Our review of the record reveals that the court imposed a sentence on count 30, first degree robbery of Tiffany Chapman at the Secret Garden Too (§§ 211, 212.5, subd. (a)), but stayed the sentence under section 654. However, nowhere in the abstract of judgment is there a sentence on count 30, stayed or otherwise.

As a final point, the court imposed a $1,180 court facilities fee under Government Code section 70373. That section requires a court to impose an assessment of $30 for each felony conviction. Since appellant was convicted of 39 counts, and 39 multiplied by $30 equals $1,170, the court erred in imposing a court facilities fee of $1,180. The court can correct its calculation on remand.

### Disposition

The judgment is reversed. The matter is remanded to the trial court to hold a hearing to determine whether appellant is entitled to presentence conduct credits; to clarify appellant's determinate sentence; and to correct errors in the abstract of judgment and in the amount of the court facilities fee.

_____
ELIA, J.

WE CONCUR:



_____
RUSHING, P. J.




_____
WALSH, J.[*]




---

[*]Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution